EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| **MUHAMMED BAZZI** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 5:11-cv-00353-H** |
| **vs.** | ) | |
| | ) | |
| **PA NDERRY MBAI,** | ) | **JUDGE MALCOLM J. HOWARD** |
| **FREEDOM NEWSPAPER, INC. AND** | ) | |
| **JOHN DOE** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**APPENDIX OF UNREPORTED CASES TO**
**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION TO DISMISS AND MOTION TO STRIKE**

*See Jackson v. Mecklenburg County*, 2008 U.S. Dist. LEXIS 104410, *18 (W.D.N.C. July 30, 2008)

*RDLG, LLC v. RPM Group LLC*, 2010 U.S. Dist. LEXIS 142881, *29-30 (W.D.N.C. Dec. 21, 2010)

*Diario El Pais, S.L. v. Nielsen Co.*, 2008 U.S. Dist. LEXIS 92987, *20 (S.D.N.Y. Nov. 6, 2008)

*Esancy v. Quinn*, 2006 U.S. Dist. LEXIS 8479, at *3 (W.D.N.C. 2006)

*Haylash v. Volvo Trucks N. Am.*, 1998 U.S. Dist. LEXIS 12511, *8-9 (D.N.C. Apr. 10, 1998)

*Shella v. Foster*, 2006 N.C. App. LEXIS 1216, *6 (N.C. Ct. App. June 6, 2006)



**BRENDA R. JACKSON and LYNN C. BECKER, Plaintiffs, vs. MECKLENBURG COUNTY, NORTH CAROLINA, and SUSAN VILLESCAS, JANET CAMERON, and LYNDA CAYAX, Individually, Defendants.**

**CIVIL ACTION NO. 3:07-cv-218**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION**

**2008 U.S. Dist. LEXIS 104410**

**July 30, 2008, Decided
July 30, 2008, Filed**

**COUNSEL:** [*1] For Brenda R. Jackson, Lynn C. Becker, Plaintiffs: Jenny L. Sharpe, LEAD ATTORNEY, Jenny L. Sharpe, Attorney at Law, Charlotte, NC.

For Mecklenburg County, Defendant: Richard Lee Rainey, LEAD ATTORNEY, Womble, Carlyle, Sandridge & Rice, Charlotte, NC.

For Susana Villescas, Defendant: Louis L. Lesesne, Jr., LEAD ATTORNEY, Essex Richards, P.A., Charlotte, NC; Richard Lee Rainey, Womble, Carlyle, Sandridge & Rice, Charlotte, NC.

For Janet Cameron, Defendant: Felicia A. Washington, LEAD ATTORNEY, K&L Gates LLP, Charlotte, NC; Richard Lee Rainey, Womble, Carlyle, Sandridge & Rice, Charlotte, NC.

For Lynda Cayax, Defendant: Philip M. VanHoy, Stephen J. Dunn, LEAD ATTORNEYS, Van Hoy, Reutlinger, Adams & Dunn, Charlotte, NC; Richard Lee Rainey, Womble, Carlyle, Sandridge & Rice, Charlotte, NC.

**JUDGES:** Graham C. Mullen, United States District Judge.

**OPINION BY:** Graham C. Mullen

**OPINION**

**ORDER**

**THIS MATTER** is before the Court on Defendants' Mecklenburg County, North Carolina ("County"), Susan Villescas ("Villescas"), Jane Cameron ("Cameron"), and Lynda Cayax ("Cayax") Motion To Dismiss Plaintiffs' Brenda R. Jackson ("Jackson") and Lynn C. Becker ("Becker") claims for breach of contract, defamation, violation of 42 U.S.C. § 1983, [*2] negligent supervision and retention, defamation, and tortious interference with contract for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, this Motion is **GRANTED.**

**I. FACTUAL BACKGROUND**

The County hired Jackson on November 24, 2004 as Deputy Director of the Mecklenburg County Department of Social Services ("DSS"). As Deputy Director, Jackson was a member of the DSS Senior Executive Team ("SET") and reported directly to DSS Director Richard Jacobsen ("Jacobsen").

In early 2005, Jacobsen suffered a stroke and took an extended medical leave. Jackson served as interim

director until Jacobsen's return on August 8, 2005. Jackson resumed her duties as Deputy Director, but soon communicated grievances regarding Jacobsen's performance to several coworkers, including County Manager Harry L. Jones. These grievances alleged that Jacobsen was extremely forgetful, impulsive, inappropriately angry, that he exercised poor judgment, and was negatively affecting DSS operations. Jackson also alleged Jacobsen made inappropriate, implicitly racial jokes.

In November 2006, Mecklenburg County Administrative Services Director, Villescas, filed an internal grievance with [*3] Jacobsen accusing Jackson of discriminatory treatment and of generally undermining the DSS Director. Jacobsen requested an investigation of allegations against Jackson. Becker, administrative assistant to Jacobsen, was also questioned during the investigation. The investigation's report concluded that Jackson engaged in violations of County policy, created a schism in the uppermost levels of management at DSS, and undermined Jacobsen's authority as Director. The report stated that Jackson and Becker enjoyed "free reign" during the director's absence and expected promotions. Ganzlmar advised Jacobsen that "like any CEO, [Jacobsen] is entitled to the undivided loyalty of his senior executive staff" and recommended termination of Jackson and Becker.

The County offered a cash payment to Jackson on March 30, 2007 in exchange for her resignation and release of future claims against the County and its employees. Jackson entered into a "Resignation & Transition Agreement" ("Agreement") with the County on April 5, 2007. (Doc. No. 6, Ex. A). This Agreement required the County to "pay [e]mployee [Jackson] $ 25,000" and "provide neutral comments to third parties and/or prospective employers about [*4] [e]mployee and her Mecklenburg County Service" in exchange for Jackson's agreement to "release[], waive, and forever discharge[] Mecklenburg County . . . and employees . . . from any and all actions, suits, demands, damages, claims. . . ." *Id.* at 2, 3.

Eight days after Jackson's resignation, Becker submitted an email resignation to Jacobsen, nineteen other DSS employees, and the Board of County Commissioners. Becker's resignation email accused County employee Cameron of "making racist . . . remarks" and accused Cameron and Villescas of openly "celebrating Brenda Jackson's resignation." Becker also referenced a November memo from Cameron to Jacobsen that allegedly accused Becker of "dishonesty" and of having a "poor attitude towards team building." County Commissioner Bill James ("James") replied to Becker's resignation with an email to the entire County and members of the local media requesting more information regarding Becker's resignation. James stated that he wanted the Board to be "informed of such details" when a long-time DSS staffer accuses supervisors of racism.

Jackson now brings various breach of contract and tort claims against the County, alleging first that her contractual [*5] release barring such claims is null and void due to the County's own breach of the agreement. Jackson alleges James's emails violated the County's non-disparagement obligations, under P 4 of the release, and that her obligation to release the County and its employees from claims is therefore null and void.

Becker brings suit under 42 U.S.C § 1983 and alleges she was discharged in retaliation for protected speech made during the County race discrimination investigation. She also alleges that County Manager Jones's emails defamed her and that the County was negligent in its supervision, retention, and investigation of DSS employees. Becker also brings claims against individual Defendants Villescas, Cameron, and Cayax, alleging these individuals made defamatory statements to the County in an effort to induce the County to terminate her employment.

## II. DISCUSSION

The Court will analyze each Plaintiff's claims individually.

### A. Standard of Review

"The federal rules apply to civil actions removed to the United States district courts . . . and govern procedure after removal." Fed. R. Civ. P. 81(c). North Carolina substantive law applies to the elements of Plaintiffs' state law claims but the Federal [*6] Rules of Civil Procedure govern procedural law and North Carolina "pleading requirements, so far as they are concerned with the degree of detail to be alleged, are irrelevant in federal court even as to claims arising under state law." *Andresen v. Diorio*, 349 F.3d 8, 17 (1st Cir. 2003) (citations omitted); *See Bartlett v. Frederick County*, 246 Fed. Appx. 201 (4th Cir. 2007) (applying the Fed. R. Civ. P. 9

pleading standard to a removed state court complaint).

Under Fed. R. Civ. P. 12(b)(6), a motion to dismiss for failure to state a claim upon which relief may be granted should be allowed if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The allegations in plaintiff's complaint are presumed true at this stage and all reasonable factual inferences must be construed in plaintiff's favor. *Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.,* 311 U.S. App. D.C. 224, 52 F.3d 373, 375 (D. C. Cir.1995). However, "the court need not accept inferences drawn by plaintiff if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." [*7] *Kowal v. MCI Commc'ns Corp.,* 305 U.S. App. D.C. 60, 16 F.3d 1271, 1276 (D. C. Cir.1994). To survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl.,* 127 S.Ct. at 1965.

**B. Plaintiff Jackson's Claims Against the County and Individual Defendants**

1. Breach of Contract Claim

Jackson's breach of contract claim fails to allege facts that support a plausible inference of breach of contract by the County. To establish a breach of contract under North Carolina law, a plaintiff must show: "(1) the existence of a valid contract and (2) breach of the terms of [the] contract." *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners,* 172 N.C. App. 427, 436, 617 S.E.2d 664 (2005) *(quoting Poor v. Hill,* 138 N.C. App. 19, 26, 530 S.E.2d 838 (2000)). Although Jackson proves the existence of a valid contract, she fails to demonstrate the breach of that contract.

*i. Existence of a Valid Contract*

A valid contract requires an agreement based upon a meeting of the minds and sufficient consideration. *Creech v. Melnik,* 147 N.C. App. 471, 477, 556 S.E.2d 587, 591 (2001). Jackson meets her burden to allege the existence of a valid contract. The Agreement, referenced in the complaint [*8] and attached to the Defendant's Brief in Support of Motion to Dismiss (Doc. No. 6, Ex. A), was signed by both parties on April 5, 2007 and was supported by consideration.

*ii. Breach of the Terms of the Contract*

Jackson specifically alleges that the County violated the "Neutral References and Nondisparagement" provision of the Agreement by publishing non-neutral statements to members of the local media. The "Neutral References and Nondisparagement" provision of the Agreement states that

Employer agrees to provide neutral comments and references to third parties and/or prospective employers about Employee and her Mecklenburg County service, as long as Employee complies with the Terms of this Agreement. Employer agrees to provide prospective employers a statement that, pursuant to County Policy, only the following information about Employee's Mecklenburg County employment can be disclosed: her dates of service, final position title, compensation history, all positions held (including Acting DSS Director), and performance evaluations. Employer also agrees to make only the following statement about Employee's separation: "Ms. Jackson resigned her position with the Mecklenburg County Department [*9] of Social Services on April 5, 2007 to attend to family matters and then to pursue other career opportunities." The Parties acknowledge that Employer will have to comply with any court order compelling disclosure of information in Employee's Personnel File or Mecklenburg County work history. In the event of litigation or administrative appeal or challenge by or on behalf of Employee against Employer, the provisions of this paragraph 4 are no longer applicable to or binding upon Employer. Employee agrees not to make disparaging comments to any third parties regarding Mecklenburg County, the Mecklenburg County Department of Social Services, Richard W. Jacobsen, Jr., or any other officer or employee of either. The Parties acknowledge and agree that this provision is essential to this agreement and that breach of this

provision by either party relieves the other party of any obligation to comply with this paragraph 4.

(Doc. No. 6, Ex. A at 2).

Jackson alleges that emails sent to members of the local media, specifically James's email regarding Jackson's resignation, did "not contain neutral comments or even the scripted comments concerning her separation from employment . . . as required [*10] by the [Agreement]" and therefore breached P 4 of the Agreement. In his email, that James wrote that his request for information was appropriate because he did not believe "it is inappropriate for the Board to be informed . . . when a long time DSS staffer accuses supervisors of racism and other activity not becoming of County employees." These facts, even when viewed in the light most favorable to Jackson, do not refer to Jackson specifically, and therefore, do not meet the standard of a claim for breach of the "Neutral References and Nondisparagement" provision of the Agreement.

2. 42 U.S.C. § 1983, Negligent Supervision and Retention, Defamation, and Tortious Interference with Contract

Jackson's claims for deprivation of constitutional rights under 42 U.S.C. § 1983, negligent supervision and retention, and defamation against the County are barred by her release of claims against the County and its employees in the Agreement. "A release is an agreement to relinquish a claim or right to the person against whom the claim exists or the right is to be enforced or exercised." *VF Jeanswear Limited Partnership v. Molina,* 320 F. Supp. 2d 412, 418 (M.D.N.C. 2004). "When a release is executed [*11] in exchange for valuable consideration, the release provides a complete defense to an action for damages." *Id.* at 419 (citing *Talton v. Mac Tools, Inc.,* 118 N.C. App. 87, 90, 453 S.E.2d 563 (1995). A party may seek to declare a contractual release null and void, and thereby rescind or cancel their obligations under the release, although this "right to rescind does not exist where the breach is not substantial and material and does not go to the heart of the agreement." *Fletcher v. Fletcher,* 123 N.C. App. 744, 751, 474 S.E.2d 802 (1996) *(citing Wilson v. Wilson,* 261 N.C. 40, 43, 134 S.E.2d 240 (1964)). Rescission of a contract is an equitable remedy and a plaintiff seeking rescission of his or her obligations "must return or offer to return whatever he may have

received from the defendant." *York v. Cole,* 254 N.C. 224, 225, 118 S.E.2d 419 (1961); *Accord Melton v. Family First Mortg. Corp.,* 156 N.C. App. 129, 136, 576 S.E.2d 365, 371 (2003) (citing *Opsahl v. Pinehurst Inc.,* 81 N.C. App. 56, 65, 344 S.E.2d 68 (1986)) ("[a]s a general rule, a party is not allowed to rescind where he is not in a position to put the other in status quo by restoring the consideration passed.")

Jackson executed the release of claims on April 5, 2007 in exchange for extended medical benefits, [*12] a mutual non-disparagement and neutral reference obligation, and the County's one-time payment of $ 25,000 to her. This consideration was conferred upon Jackson in exchange for her obligation to "release[], waive, and forever discharge[] Mecklenburg County . . . and employees . . . from any and all actions, suits, demands, damages, claims . . . ." (Doc. No. 6, Ex. A at 2, 3). Despite arguing that the Agreement is null and void, Jackson does not offer to return the consideration. Jackson may not unilaterally retain the consideration and simultaneously attempt to rescind her corresponding obligations under the Agreement. Allowing Jackson to proceed without pleading facts that support the return of the consideration of the bargain would create an inequitable result. Jackson is limited to contractual damages for the County's alleged breach of contract. Her remaining claims are precluded by her remaining obligations under the Agreement not to sue the County and its employees.

## C. Plaintiff Becker's Claims Against the County and Individual Defendants

1. Slander and/or Defamation Per Se Against the County

A claim for defamation entails a false and defamatory statement, of or concerning plaintiff, [*13] which was published to a third person and caused injury to plaintiff's reputation. *See Smith-Price v. Charter Behavioral Health Sys.,* 164 N.C. App. 349, 595 S.E.2d 778 (2004). Becker alleges that County Manager Harry Jones's statement that "sometimes what can happen and what does happen . . . there are some people where we've experienced instances where false claims are made by employees to redirect the focus away from their own inappropriate behavior, " constitutes slander and/or defamation per se.

*i. Defamation Per Se*

Becker fails to state a claim for defamation per se. Although Becker correctly recognizes there is no heightened pleading standard for defamation claims under the federal rules, the complaint still must set forth facts that raise the complainant's right to relief under the elements of a state law defamation per se claim beyond a merely speculative level. "A publication is . . . actionable per se, if, when considered alone without innuendo, (1) [i]t charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to ridicule, contempt or disgrace, or (4) it tends to impeach one in his trade or profession." *Ellis v. Northern Star Co.,* 326 N.C. 219, 388 S.E.2d 127 (1990) [*14] (citing *Flake v. News Co.,* 212 N.C. 780, 787, 195 S.E. 55 (1938)). "Under North Carolina law, slander per se is an oral communication to a third party which amounts to (1) an accusation that the plaintiff committed a crime involving moral turpitude; (2) an allegation that impeaches the plaintiff in his trade, business, or profession; or (3) an imputation that the plaintiff has a loathsome disease." *Losing v. Food Lion, LLC,* 185 N.C. App. 278, 648 S.E.2d 261, 263 (N.C. Ct. App. 2007) (citations omitted). "When pleading a defamation claim, the allegedly defamatory statement made or published by the defendant does not have to be set out verbatim in the plaintiff's complaint if alleged 'substantially in haec verba or with sufficient particularity to enable the court to determine whether the statement was defamatory.'" *Esancy v. Quinn,* 2006 U.S. Dist. LEXIS 8479, WL 322607 at 4 (W.D.N.C. 2006) (unpublished opinion) (quoting *Stutts v. Duke Power Co.,* 47 N.C. App. 76, 83-4, 266 S.E.2d 861 (1980)). To be actionable per se, "[d]efamatory words . . . must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him [*15] to be shunned or avoided." *Renwick v. News And Observer Pub. Co.,* 310 N.C. 312, 317-18, 312 S.E.2d 405 (1984) (citations omitted). "In determining whether the [publication] is libelous per se [it] must be construed stripped of all insinuations, innuendo, colloquium and explanatory circumstances." *Id.* at 318. The North Carolina Supreme Court stated that "the initial question . . . in reviewing a claim for libel per se is whether the publication is such to be subject to only one interpretation" and that it is then "for the court to say whether that [interpretation] is defamatory." *Id.* at 319.

Becker's complaint fails to state a claim under the North Carolina defamation per se standard. Manager Harry Jones's statement is an insinuation that could refer to Becker, but if stripped of all insinuations and explanatory circumstances, as is required by North Carolina defamation law, this statement does not mention Becker by name and is susceptible to two different interpretations: 1) that it is a direct reference to Becker or 2) that it is a more general statement about situations where employees have made false claims to redirect the focus away from their own inappropriate behavior. Becker's complaint does [*16] not allege any other type of libel claim, nor does it allege that the defamatory statement is subject to more than one interpretation. This Court cannot presume that the statement is subject to one defamatory interpretation. Accordingly, Becker's defamation per se claim fails as a matter of law.

### ii. Slander per se

Slander per se is a false statement which is orally communicated to a third party and amounts to: 1) an accusation that the plaintiff committed a crime involving moral turpitude; 2) an allegation that impeaches the plaintiff in his trade, business, or profession; or 3) an imputation that the plaintiff has a loathsome disease. *Barker v. Kimberly-Clark Corp.,* 136 N.C. App. 455, 524 S.E.2d 821 (N.C. Ct. App. 2000). Becker alleges that County Manager Jones' written statement issued to the media which read "sometimes what can happen and what does happen . . . there are some people where we've experienced instances where false claims are made by employees to redirect the focus away from their own inappropriate behavior" constitutes slander per se.

Becker fails to state a claim for slander per se for two principal reasons. First, Becker does not allege the statement was orally communicated to a third [*17] party - the statement was a written one issued to the media. Second, as the statement does not specifically mention Becker, it similarly fails to meet the standard.

### 2. Slander and/or Defamation Per Se Against Individual Defendants

#### i. *Defendants Villescas & Cayax*

Becker fails to state a claim for defamation against Villescas and Cayax because the complaint does not set forth published statements in haec verba made by either Defendant that mention or refer to Becker. Becker conclusively states that "allegations made by Villescas,

Cameron, and Cayax to Defendant County's DSS Director and to its Human Resources Director regarding Plaintiff's supposed disloyalty and/or violations of County policy" constitutes slander and/or defamation per se. Becker's complaint does not set forth the substance of the alleged statements in haec verba beyond that they generally involved "disloyalty" and "violations of County policy." Becker's claim for individual slander and/or defamation per se against Defendants Villescas and Cayax fails as a matter of law.

### ii. *Defendant Cameron*

Becker fails to state a claim for slander or libel per se against Cameron. Becker's complaint includes mention of two statements made [*18] by Cameron that Becker alleges constitute libel. The first is an email written by Becker that states, "[Defendant Cameron] is free to continue making racist, inflammatory, hateful personal remarks." The second is another email sent by Becker that reads, "Janet Cameron, who in a November memo to you accused me [Plaintiff Becker] of dishonesty and having a poor attitude toward team building . . . ."

Neither of these statements meet the standard of defamatory. Becker's first email allegation does not set forth an allegedly defamatory statement in haec verba. It is a conclusive allegation that Cameron generally makes "racist, inflammatory, and hateful personal remarks," and is insufficient to support a claim for defamation. Becker's second email allegation also fails to set forth an actionable claim. "North Carolina cases have held consistently that alleged false statements made by defendants, calling plaintiff 'dishonest' or charging that plaintiff was an unfaithful and an unreliable employee, are not actionable per se." *Stutts v. Duke Power Co.,* 47 N.C. App. 76, 266 S.E.2d 861, 865 (N.C. Ct. App. 1980). Further, if a statement "cannot be reasonably interpreted as stating 'actual facts' about an individual, [*19] it cannot be the subject of a defamation suit." *Daniels v. Metro Magazine Holding Co.,* 179 N.C. App. 533, 634 S.E.2d 586, 590 (N.C. Ct. App. 2006). Cameron's alleged accusation that Becker is dishonest and possesses a poor attitude towards team-building is a statement of opinion and is too vague to be reasonably interpreted as stating "actual facts" about Becker.

Accordingly, Becker's claims for defamation against individual defendants Villescas, Cayax and Cameron fail as a matter of law.

### 3. 42 U.S.C. § 1983 Constitutional Rights Violation

Becker fails to state a claim for deprivation of constitutional rights under § 1983. To state a claim under § 1983, a plaintiff must establish: 1) that the defendant "deprived [Becker] of a right secured by the Constitution or laws of the United States" and 2) "that the alleged deprivation was committed under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49-50, 119 S. Ct. 977, 143 L. Ed. 2d 130 (1999). Becker argues she was terminated in retaliation for constitutionally protected speech, including: 1) her expression of concerns regarding Jacobsen, made in response to questions asked during a County employee investigation, and 2) her written statement to Jacobsen criticizing [*20] the County's race discrimination investigation.

A plaintiff seeking to recover for First Amendment retaliation must establish three elements: "[F]irst, the public employee must have spoken as a citizen, not as an employee, on a matter of public concern. Second, the employee's interest in the expression at issue must have outweighed the employer's interest in providing effective and efficient services to the public. Third, there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action." *Smith v. Frye,* 488 F.3d 263, 267 (4th Cir. 2007) (citation omitted). The first two factors involve questions of law, while the third factor involves an issue of fact. *See Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 352 (4th Cir. 2000).

Becker fails to allege facts that bring her claim outside that of an employee speaking pursuant to official duties. In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006), the Supreme Court addressed the threshold legal requirement for a violation of First Amendment right to free speech that a plaintiff speak as an individual on a matter of public concern, not as a public employee regarding employee [*21] duties. "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421.

Becker's § 1983 claim fails because her expression was made pursuant to her official duties as a County employee. Becker's first series of statements regarding Jacobsen were made in direct response to County human

resources personnel conducting an official race discrimination investigation. Every County employee had a duty to cooperate and respond to questions solicited during the official investigation. Becker's statements were not made as an individual citizen speaking on a matter of public concern, but as a response to an official investigation. Additionally, Becker's written memo to Jacobsen criticizing the County human resources investigation fails under the second legal threshold requiring Becker's interest in the expression to outweigh the County's interest in providing effective public services. There is a compelling interest to the community for the DSS to promptly and accurately investigate claims of racial discrimination, [*22] in order to provide effective public services. The County is legally obligated to promptly and efficiently resolve claims of racial discrimination in the public workplace by a wealth of regulatory law. Becker's interest in her statement, that the investigation was a "witch hunt," does not outweigh the County's interest in providing effective public services. Becker's second allegation of protected expression therefore fails as a matter of law.

4. Tortious Interference with Contract

"The elements of tortious interference are: (1) the existence of a valid contract between plaintiff and a third party; (2) knowledge by defendant of the contract; (3) acts by defendant to intentionally induce the third party not to perform the contract; (4) defendant's acts were committed without justification; and (5) actual damage to the plaintiff." *United Lab. v. Kuykendall,* 322 N.C. 643, 661, 370 S.E.2d 375 (1988). "A plaintiff may maintain a claim for tortious interference with contract even if the employment contract is terminable at will." *Esposito v. Talbert & Bright, Inc.,* 181 N.C. App. 742, 745, 641 S.E.2d 695 (2007) (citations omitted). "As a general rule, non-outsiders [to the contract] often enjoy qualified immunity from [*23] liability for inducing their corporation or other entity to breach its contract with an employee," although "[t]he qualified privilege of a non-outsider is lost if exercised for motives other than reasonable, good faith attempts to protect the non-outsider's interests in the contract interfered with." *Bloch v. The Paul Revere Life Ins. Co.,* 143 N.C. App. 228, 240, 547 S.E.2d 51 (2001) (citations omitted). Defendants argue that Becker fails to allege sufficient facts to support the second and third elements of her claim.

*i. Defendants Villescas and Cayax*

Becker fails to allege facts constituting "acts" committed by Villescas or Cayax. Becker relies on the allegation that "upon information and belief, Defendants Villescas, Cameron, and Cayax intentionally induced Defendant County to terminate its employment relationship with Becker by deliberately making false statements against her regarding her conduct." The complaint does not allege facts identifying the content, time, or actual occurrence of false statements and fails to put Villescas and Cayax on notice of the basis of Becker's claim. This failure to plead facts instead of conclusory allegations makes Becker's claim of tortious interference with [*24] contract against Villescas and Cayax merely speculative, and it fails as a matter of law.

*ii. Defendant Cameron*

Becker likewise fails to state a claim for tortious interference with contract against Cameron. To establish a claim for tortious interference, it is not enough that a plaintiff plead a defendant has taken some action which has led to the termination of her employment. A plaintiff must affirmatively allege that the defendant's intent was to bring about the termination. *See White v. Cross Sales & Engineering Co.,* 177 N.C. App. 765, 629 S.E.2d 898 (N.C. Ct. App. 2006). The November memo written by Defendant Cameron allegedly accused Becker of "dishonesty" and of having a "poor attitude towards team building." Becker fails to offer any evidence that Cameron wrote the memo with the intent to bring about Becker's termination. With regard to the fourth element of tortious interference, in alleging that the statement was made "without justification" on the ground that Cameron deliberately made false statements, as analyzed above, Cameron's memo represented a statement of opinion and is therefore not capable of being judged for accuracy in terms of being true or false.

Accordingly, Becker fails to state [*25] a claim for tortious interference with contract against any individual defendant.

5. Negligent Supervision and Retention

Becker fails to state a claim for negligent supervision and retention against the County. To state a claim for negligent supervision and retention, Plaintiff Becker must sufficiently allege: "(1) that an incompetent employee committed a tortious act resulting in injury to the

plaintiff; and (2) that prior to the act, the employer knew or had reason to know of the employee's incompetency." *Smith v. First Union Nat. Bank,* 202 F.3d 234, 250 (4th Cir. 2000) (citing *Hogan v. Forsyth Country Club Co.,* 79 N.C. App. 483, 340 S.E.2d 116 (1986)).

Even if this Court agreed with Becker's claim that defamation per se against Cameron constitutes an allegedly tortious act committed by a County employee, Becker fails to allege that the County knew or had reason to know of Cameron's incompetency prior to this tortious act. Although the complaint generally alleges the County had "reason to know the allegations" that Cameron's allegations were false, this only addresses the County's knowledge of incompetency regarding the actual tortious act; and does not address the threshold requirement that the County [*26] knew or had reason to know of the employee's incompetency prior to the tortious act. Absent any allegation by Becker that the County knew or had reason to know of Cameron's incompetency prior to the allegedly tortious act (Defendant Cameron's November memo), Becker fails to state a claim for negligent supervision and retention.

**D. Plaintiffs' Alternative Motion for Leave to Amend Complaint**

Jackson and Becker alternatively state that "should this Court find the complaint to be insufficiently pled in any respect, Plaintiffs request leave of court to amend their complaint." The Federal Rules of Civil Procedure allow Plaintiffs "to amend [their] pleading once as a matter of course . . . before being served with a responsive pleading . . . ." Fed. R. Civ. P. 15(a).

Jackson and Becker were free to amend their complaint at any time before the County filed its Motion to Dismiss and had not yet served a responsive pleading. *See Smith v. Blackledge,* 451 F.2d 1201, 1203 n.2 (4th Cir. 1971) (holding that a motion to dismiss is not a responsive pleading for purposes of Rule 15(a)). Granting leave of Court to amend Plaintiffs' complaint when the Rules do not require such leave and when such a request [*27] is expressly conditioned on this Court's evaluation of particular deficiencies in the complaint, constitutes an impermissible advisory opinion and Plaintiffs' conditional motion for leave is denied.

**IT IS THEREFORE ORDERED** that the County's Motion To Dismiss with regard to all causes of action against both the County and individual defendants is hereby **GRANTED.**

Signed: July 30, 2008

/s/ Graham C. Mullen

Graham C. Mullen

United States District Judge



**RDLG, LLC, Plaintiff, Vs. RPM GROUP, LLC; RPM GROUP BROKERAGE, LLC; FRED M. LEONARD, III; JESSICA LEWIS LEONARD; JASON BENTON; NICK JAMES; and DEXTER HUBBARD, Defendants. RPM GROUP, LLC, Plaintiff, Vs. RDLG, LLC; and GLENN G. GOLDAN, Defendants.**

**1:10cv204 consolidating 1:10cv204 & 1:10cv2331:10cv233**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA, ASHEVILLE DIVISION**

**2010 U.S. Dist. LEXIS 142881**

**December 21, 2010, Decided
December 21, 2010, Filed**

**SUBSEQUENT HISTORY:** Accepted by, Objection overruled by, Complaint dismissed at RDLG, LLC v. RPM Group, LLC, 2011 U.S. Dist. LEXIS 47514 (W.D.N.C., May 2, 2011)

**COUNSEL:** [*1] For RDLG, LLC, Plaintiff, Counter Defendant: Daniel J. Finegan, Ross Robert Fulton, LEAD ATTORNEYS, G. Kirkland Hardymon, Rayburn, Cooper & Durham, P.A., Charlotte, NC.

For RPM Group, LLC, RPM Group Brokerage, LLC, Fred M. Leonard, III, also known as Chip Leonard, Jessica Lewis-Leonard, Jason Benton, Nick James, Defendants: Keith Lane Edmiston, LEAD ATTORNEY, PRO HAC VICE, Gribble Carpenter & Associates, PLLC, Maryville, TN; Tikkun A.S. Gottschalk, LEAD ATTORNEY, Asheville, NC.

For Dexter Hubbard, Defendant: Charles R. Brewer, Tikkun A.S. Gottschalk, LEAD ATTORNEYS, Asheville, NC; Christopher Garrison Lewis, LEAD ATTORNEY, Teague Campbell Dennis & Gorham, Raleigh, NC.

For Jason Benton, RPM Group Brokerage, LLC, Nick James, RPM Group, LLC, Fred M. Leonard, III, Jessica

Lewis-Leonard, Counter Claimants: Tikkun A.S. Gottschalk, LEAD ATTORNEY, Asheville, NC.

**JUDGES:** Dennis L. Howell, United States Magistrate Judge.

**OPINION BY:** Dennis L. Howell

**OPINION**

**MEMORANDUM AND RECOMMENDATION**

**THIS MATTER** is before the court on defendants RDLG, LLC's and Glenn G. Goldan's (hereinafter "defendants") Motion to Dismiss (#30).[1] On November 15, 2010, plaintiff RPM Group, LLC (hereinafter "plaintiff") filed its Response (#31, at p. 32), and [*2] on November 29, 2010, the defendants filed their Reply (#31, at p. 41). Such motion is now ripe for consideration.[2] Having carefully considered such motions, the briefs, and the Complaint, the undersigned respectfully submits the following findings, conclusions, and recommendation.[3]

1 The Motion to Dismiss (#27) filed December 6, 2010, is not ripe for consideration, but is

directed to counterclaims which mirror the claims discussed herein. The doctrine of *law of the case* may, respectfully, provide resolution of that motion once the district court has resolved the motion that is the subject of this recommendation.
2 These actions were consolidated, and docket entry numbers cited reference the pleadings in the consolidated case.
3 The court notes that the plaintiff did not allege in its Complaint the names of its own members or the members of the defendants, both of which are LLCs. See Carden v. Arkoma Associates, 494 U.S. 185, 195, 110 S. Ct. 1015, 108 L. Ed. 2d 157 (1990); Mecklenburg County v. Time Warner Entertainment-Advance/ Newhouse Partnership, 2010 U.S. Dist. LEXIS 6215, 2010 WL 391279 (W.D.N.C. Jan. 26, 2010). In the Notice of Removal (#1), the defendants state that RDLG, LLC, has two members: the first is a California LLC consisting of 31 members, [*3] all of which are residents of either California or New Jersey; and that the second member is a California resident acting as a receiver for a California corporation. It goes on to state that the plaintiff is also an LLC, the members of which are all citizens and residents of Tennessee. Notice of Removal, at ¶¶ 8-9.

## FINDINGS AND CONCLUSIONS

### I. Background

### A. Plaintiff's Contentions

This action concerns a marketing agreement for the sale of the remaining residential building lots in a development located in McDowell County, North Carolina. In the summer of 2010, defendant RDLG, LLC, a California land development company, hired the plaintiff, a real estate marketing firm located in Tennessee, to market and then sell during an on-location sales event the remaining, unsold lots in defendants' development, which is known as "Linville Falls Mountain Club and Preserve." See Complaint (hereinafter "Compl."), Ex. 1 ("Marketing Agreement").

Plaintiff alleges in its Complaint that the parties agreed to split the upfront $425,000.00 marketing costs, with the plaintiff first recouping its costs by receiving 100 percent (100%) of the net proceeds of lots sales until their costs were reimbursed and that [*4] defendants

would, thereafter, recoup their costs in a similar manner. Compl., at ¶¶ 12-13. After both parties' costs were recouped, the plaintiff would then be entitled to receive a commission of 22 percent (22%) of the gross sales price of each lot closed. Id., at ¶ 13.

The plaintiff alleges that in the run-up to the sales event, defendants failed to make lot improvements required "in accordance with the approved HUD form," and that this failure eventually resulted in fewer lot sales at lower prices. Id., at ¶ 14. It further alleges that, beyond failing to make improvements to the lots, the defendants failed to otherwise fulfill their obligations under the marketing agreement, including failing to assist plaintiff in pricing the lots, failing to provide plats, failing to reimburse marketing costs, and failing "to pay commissions to RPM." Id., at ¶ 16.

### B. Plaintiff's Claims for Relief

In its First Claim for Relief, the plaintiff asserts a cause of action for breach of contract. Id., at ¶¶ 17-19. It contends that the defendants breached the marketing agreement by failing to make the property ready for sale, failing to cooperate, and failing to make information and documentation available, [*5] all of which it contends were required by the agreement. Id., at ¶¶ 17-18. The plaintiff projects that had defendants honored the agreement, it would have sold a substantial majority of the 102 available lots, rather than the 18 lots it actually sold, which would have resulted in "commissions to RPM in excess of $800,000.00." Id., at ¶ 18. It alleges that it sustained damages of at least $212,500.00 in un-reimbursed marketing expenses, incurred additional damages when it performed the defendants' obligations in making the properties ready for sale, lost commissions, and sustained other damages. Id., at ¶ 19.

In its Second Claim for Relief, the plaintiff asserts a cause of action for tortious interference with the contract asserted in the first claim. Id., at ¶¶ 20-25. In this cause of action, plaintiff alleges that the corporate defendant was being "directed and controlled" by defendant Glenn G. Goldan (hereinafter "Mr. Goldan" or "Defendant Goldan"), id., at ¶ 20, that Mr. Goldan knew of the agreement, id., at ¶ 21, and that despite his knowledge of the agreement, he *personally* interfered with the corporate defendant's performance of its obligations under the marketing agreement, ordering [*6] agents of such defendant to not perform their obligations under the marketing agreement. Id., at ¶ 22.[4] Further, the plaintiff

alleges that Mr. Goldan interfered with the contract by ordering the closing attorney "not to withhold commissions due RPM...." Id., at ¶ 23.[5]

> 4   The court notes that the plaintiff stated in its complaint that Mr. Goldan "can be served with process at Reprop Financial Mortgage Investors, LLC, . . . ." Compl., at ¶ 2. In their Notice of Removal, the defendants states that Reprop Financial Mortgage Investors, LLC, is one of the members of RDLG, LLC. Notice of Removal (#1), at ¶ 6(a). Finally, review of the "Civil Summons" issued by the state court reveals that process was issued for Mr. Goldan at his business address. No return of service as to Mr. Goldan was provided in the removal package and the court notes the absence of such proof of service subsequent to removal. See Fed.R.Civ.P. 4(e).
>
> 5   The court assumes that plaintiff meant to state that the closing attorney was directed not to pay the commissions.

In its Third Claim for Relief, plaintiff asserts a cause of action for defamation. Id., at ¶¶ 26-28. It alleges that Mr. Goldan "individually and on behalf of RDLG, [*7] has slandered and otherwise disparaged RPM with false statements concerning . . . the professionalism, ability, honesty, and integrity of RPM." Id., at ¶ 26. It goes on to allege damages "arising out of lost business opportunities . . . ." Id., at ¶ 27.

Plaintiff seeks compensatory as well as punitive damages.

## II. The Motion to Dismiss

On the same day this action was removed, defendants moved to dismiss the Complaint in its entirety, citing Rule 12(b)(5) and Rule 12(b)(6), Federal Rules of Civil Procedure. Defendants first contend that the Complaint should be dismissed as to Mr. Goldan under Rule 12(b)(5) for insufficient service of process, arguing that plaintiff failed to serve Mr. Goldan with the Summons and Complaint as required by Rule 4. Motion to Dismiss (#2), at p. 1.

Defendants also seek dismissal as to all claims asserted by plaintiff, contending that plaintiff fails to state a claim under Rule 12(b)(6). As to the First Claim for Relief, breach of contract, defendants argue that plaintiff cannot state a cause of action seeking lost or unpaid commissions because it is not a licensed real estate broker in North Carolina. Id. As to the Second Claim for Relief, tortious interference [*8] with contract asserted against Mr. Goldan, defendants contend that no cause of action is asserted because (1) Mr. Goldan is an officer of the corporate defendant, (2) no allegation is made that Mr. Goldan took any action for his personal benefit, and (3) there are no allegations that the corporate veil should be pierced. Id. As to the Third Cause of Action, defamation, defendants contend that the allegations are insufficient under Rule 12(b)(6) because plaintiff fails to allege publication of any defamatory statement to any third party and fail to allege any statement with such detail as to permit the court to determine whether such statement could plausibly be defamatory. Id., at p. 2.

## III. Applicable Standards

### A. Rules 12(b)(5)

On the day he removed this action, Defendant Goldan contended that he had not been properly served with process and is, therefore, entitled to dismissal under Rule 12(b)(5). Where a motion to dismiss is filed based on insufficient process or insufficient service of process, affidavits and other materials outside the pleadings may be properly submitted and considered. When a challenge to the adequacy or lack of process is made,

> the party on whose behalf service [*9] is made has the burden of establishing its validity when challenged; to do so, he must demonstrate that the procedure employed satisfied the requirements of the relevant portions of Rule 4 and any other applicable provision of law.

Light v. Wolf, 816 F.2d 746, 751, 259 U.S. App. D.C. 442 (D.C.Cir.1987) (internal quotations omitted). Where the procedural requirements of sufficient process and service of process are not satisfied, a court lacks power to assert personal jurisdiction over a defendant. Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 514, 352 U.S. App. D.C. 229 (D.C.Cir.2002). Inasmuch as the sufficiency of process and service of process concern the court's jurisdiction, consideration of materials outside the pleadings, such as affidavits, is appropriate. Dimet Proprietary, Limited v. Industrial Metal Protectives, 109 F.Supp. 472 (D. Del. 1952).

### B. Rule 12(b)(6)

Until recently, a complaint could not be dismissed under Rule 12(b)(6) unless it appeared certain that plaintiff could prove no set of facts which would support its claim and entitle it to relief. Neitzke v. Williams, 490 U.S. 319, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989); Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). This "no set of facts" standard has been specifically abrogated by the Supreme Court in [*10] recent decisions.

First, in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the Court held that the "no set of facts" standard first espoused in Conley, supra, only describes the "breadth of opportunity to prove what an adequate complaint claims, not the minimum adequate pleading to govern a complaint's survival." Id., at 563. The Court specifically rejected use of the "no set of facts" standard because such standard would improperly allow a "wholly conclusory statement of claim" to "survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." Id., at 561 (alteration in original).

Post Twombley, to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts in their complaint that "raise a right to relief above the speculative level." Id., at 555.

> [A] plaintiff's obligation to provide the "grounds" of his "entitle[ment]" to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . .

Id. (second alteration in original; citation omitted). Further, a complaint will not survive Rule 12(b)(6) [*11] review where it contains "naked assertion[s] devoid of further factual enhancement." Id., at 557. Instead, a plaintiff must now plead sufficient facts to state a claim for relief that is "*plausible* on its face." Id., at 570 (emphasis added).

While the Court was clear in Twombly that Conley was no longer controlling, see Twombly, 550 U.S. at 563, and Felman Production Inc. v. Bannai, 2007 U.S. Dist. LEXIS 81365, 2007 WL 3244638, at *4 (S.D.W.Va. 2007), it again visited the Rule 12(b)(6) pleading standard in Ashcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (May 18, 2009). In Ashcroft, the Court

determined that Rule 8 "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." Id., S.Ct., at 1949. The Court explained that, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" Id. (citing Twombly, supra; emphasis added). What is plausible is defined by the Court:

> [a] claim has facial plausibility when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

Id. This "plausibility standard" [*12] requires "more than a sheer possibility that a defendant has acted unlawfully." Id. Thus, a complaint falls short of the plausibility standard where a plaintiff pleads "facts that are 'merely consistent with' a defendant's liability . . . ." Id. While the court accepts plausible factual allegations made in a complaint as true and considers those facts in the light most favorable to plaintiff in ruling on a motion to dismiss, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt.'s Inc. v. J.D. Assoc.'s, LLP, 213 F. 3d 175, 180 (4th Cir. 2000).

In sum, when ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (*per curiam*) (citations omitted). A complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." Id., at 93 (alteration and internal quotation marks omitted). However, to survive a motion to dismiss, the complaint must "state[ ] a plausible claim for relief" that "permit[s] the court to infer more than the mere possibility of misconduct" based upon "its judicial [*13] experience and common sense." Iqbal, 129 S. Ct. at 1950. While a plaintiff is not required to plead facts that constitute a *prima facie* case in order to survive a motion to dismiss, see Swierkiewcz v. Sorema N.A., 534 U.S. 506, 510-15, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002), "[f]actual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555.

**IV. Discussion**

**A. Rule 12(b)(5)**

Defendants contend that this court should dismiss the Complaint as to Defendant Goldan because the plaintiff failed to serve such defendant. In response, the plaintiff contends that the defendants's Motion to Dismiss under Rule 12(b)(5) is premature inasmuch as the 120 days allowed for service under Rule 4 has not run. Defendants fail to address this responsive argument in their Reply.

The Complaint was filed in state court on September 20, 2010, see Notice of Removal (#1), at ¶ 1, this action was removed on October 14, 2010, id., and the Motion to Dismiss was filed the same day. The Federal Rules of Civil Procedure apply to removed actions. See Fed.R.Civ.P. 81(c)(1) ("These rules apply to a civil action after it is removed from a state court."). Rule 4(m), therefore, provides the time for service, [*14] and provides in relevant part, as follows:

> **(m) Time Limit for Service.**
>
> If a defendant is not served within 120 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specified time.
>
> * * *

Fed.R.Civ.P. 4(m).

The issue of the time for service of parties after removal of an action from state court has been specifically addressed by the district court. In Patterson v. Brown, 2008 U.S. Dist. LEXIS 9312, 2008 WL 219965 (W.D.N.C. Jan. 24, 2008), amended Patterson ex rel. Estate of Hemphill v. Brown, 2008 U.S. Dist. LEXIS 24195, 2008 WL 619374 (W.D.N.C. Mar. 03, 2008), and reversed in part on other grounds Patterson v. Whitlock, 392 Fed. Appx. 185, 2010 WL 3303749 (4th Cir. 2010),[6] Honorable Martin Reidinger, United States District Judge, held as follows:

> The Federal Rules of Civil Procedure require that a defendant be served "within 120 days after the complaint is filed." *See* Fed.R.Civ.P. 4(m). The Defendants argue that this provision means that the Plaintiff was required to serve them with process

within 120 days of the filing of the state court complaint, and therefore, the Plaintiff's attempts at service under [*15] federal law were not timely. The Plaintiff argues, on the other hand, that the time limit for service under Rule 4(m) should run instead from the date of removal.

The Middle District of North Carolina addressed this very issue in *Motsinger v. Flynt*, 119 F.R.D. 373 (M.D.N.C.1988). In that case, the defendant argued that the plaintiff's attempts to serve him after removal were untimely because Rule 4(m) required the plaintiff to serve him within 120 days after the complaint was filed in state court. The Court rejected the defendant's argument, holding that the Federal Rules of Civil Procedure applied to cases only after removal. *Id.* at 376-77 (*citing* Fed.R.Civ.P. 81(c)). The Court further noted that to apply the federal rules retroactively to state court pleadings that were otherwise properly filed under state law "may create real unfairness." *Id.* at 377. As the Court explained:

> [I]t is possible that 120 days from filing of the complaint could pass without a defendant being served. Then, having notice of the action, a defendant could remove it to federal court and immediately move for dismissal pursuant to Rule 4(j) [now Rule 4(m) ], Fed.R.Civ.P. The plaintiff would immediately be in a [*16] predicament since 120 days would have passed since the filing of the original complaint and he would not have made a motion for an extension of time to serve process.

*[I]d.* at 377 n. 5. The Court concluded that allowing a plaintiff 120 days from the date of removal to serve process "provides an appropriate balance which accommodates the federal interest in insuring that process will be timely served yet does not penalize the plaintiff or give undue advantage to the defendant...." *Id.* at 377.

Other courts that have addressed this issue have also held that the 120-day time period for service of process in a removal action runs from the date of the removal, not the date that the state court complaint was originally filed. *See Cowen*, 411 F.Supp.2d at 721; *G.G.G. Pizza, Inc. v. Domino's Pizza, Inc.*, 67 F.Supp.2d 99, 102 (E.D.N.Y.1999); *Eccles v. National Semiconductor Corp.*, 10 F.Supp.2d 514, 519 (D.Md.1998); *see also Russo v. Prudential Ins. Co.*, 116 F.R.D. 10, 12 (E.D.Pa.1986) (rejecting retroactive application of Rule 4's 120-day period to service effected prior to removal).

The Court finds the reasoning of *Motsinger* and the other above-cited decisions to be persuasive. In the present case, [*17] the action was removed on November 17, 2006. Therefore, the Plaintiff had until March 19, 2007 to serve process on the Defendants pursuant to the Federal Rules of Civil Procedure.

Patterson, 2008 U.S. Dist. LEXIS 9312, 2008 WL 219965, at 5 -6. The decision of the district court makes clear that (1) Rule 4(m) provides 120 days for service of process in an action removed from state court and (2) that the 120 days begins to run not from the date the Complaint was filed, but from the date the action was *removed* to federal court. In this case, the action was removed on October 14, 2010, and the defendants filed their Motion to Dismiss under Rule 12(b)(5) that same day. Clearly, under Patterson, the plaintiff had 120 days from such date to serve Mr. Goldan, providing no factual or legal basis for relief under Rule 12(b)(5).

6     Due to the limits of Electronic Case Filing, copies such unpublished decisions are placed in

the electronic docket through incorporation of the Westlaw citations.

The motion is, therefore, without merit and the undersigned is compelled to recommend that it be denied.

**B. Rule 12(b)(6)**

**1. First Cause of Action: Breach of Contract**

Defendants contend that the first cause of action for breach of contract [*18] must be dismissed because plaintiff, which is not a licensed real estate broker in North Carolina, seeks to enforce a contract for commissions stemming from the sale of real property in North Carolina. In response, plaintiff alleges that defendants' motion is premature inasmuch as the alleged illegality or invalidity of a contract is an affirmative defense and that it actually employed licensed brokers to conduct the sales. Response (#12), at p. 2.

In support of its argument that the sharing of commissions between licensed and unlicensed brokers of real estate does not make a contract illegal, plaintiff cites the court to Furr v. Fonville Morisey Realty, Inc., 130 N.C.App. 541, 545, 503 S.E.2d 401 (1998). Defendants have distinguished such case from the facts here. Reply (#13), at 5. More importantly, they have pointed out that such case has no legal significance in this case in light of post-Furr amendments to the North Carolina real estate broker licensure statute. Amended the year after Furr was handed down,[7] the governing statute applicable to this case provides as follows:

§ 93A-1. License required of real estate brokers.

From and after July 1, 1957, it shall be unlawful for any person, partnership, [*19] corporation, limited liability company, association, or other business entity in this State to act as a real estate broker, or directly or indirectly to engage or assume to engage in the business of real estate broker or to advertise or hold himself or herself or themselves out as engaging in or conducting such business without first obtaining a license issued by the North Carolina Real Estate Commission (hereinafter referred to as the Commission), under the provisions of this Chapter. A license shall be obtained from

the Commission even if the person, partnership, corporation, limited liability company, association, or business entity is licensed in another state and is affiliated or otherwise associated with a licensed real estate broker in this State.

N.C.Gen.Stat. 93A-1 (2010)(emphasis added). At the time Furr was decided, the same statute provided as follows:

> ... it shall be unlawful for any person, ... corporation ... in this State to act as a real estate broker or real estate salesman, or directly or indirectly to engage or assume to engage in the business of real estate broker or real estate salesman or to advertise or hold himself or themselves out as engaging in or conducting [*20] such business without first obtaining a license issued by the North Carolina Real Estate Commission ... under the provisions of this Chapter.

N.C.Gen. Stat. 93A-1 (as reported in Furr, 130 N.C.App. at 545). Noticeably, the emphasized language in the current law - - the law applicable at the time the disputed contract was entered into - - was absent from the 1998 version of the law.

7 The statute was again amended in 2005.

The current statute makes it unlawful for any person or entity to either directly or indirectly engage in the business of real estate broker without a North Carolina license, and makes it clear that mere association or affiliation of a licensed broker is insufficient. Id. This distinction between Furr and the current licensure requirement has been recently addressed by this court. In McAllister v. Hunter, 634 F. Supp. 2d 577 (W.D.N.C. 2009), Honorable Richard L. Voorhees, United States District Judge, held that an association of an unlicensed entity with a licensed entity is contrary to the present version of the statute, noting as follows:

> The purpose of this provision is especially clear in light of the circumstances surrounding its enactment. The provision was adopted [*21] the year after a North Carolina appeals court decision declared legal a commission

sharing arrangement-similar to the one in the present case-between an unlicensed out-of-state real estate agent and a licensed North Carolina real estate broker.

Id., at n. 4 (citation to Furr omitted). The court concluded that "the arrangement in this case is not one that is sanctioned by the North Carolina real estate laws." Id., at 584. The plaintiff's reliance on Furr is, therefore, misplaced. Plaintiff's alleged association of licensed brokers in conducting the sale of real property was clearly insufficient as a matter of law. Absent plaintiff being licensed in this state, it was simply unlawful for it to sell real property it did not own in North Carolina. Plaintiff lacks standing to demand those commissions in this action, and plaintiff simply cannot assert a plausible claim for breach of contract under such circumstances.

The undersigned will now turning back to the original question posed: whether the breach of contract claim is susceptible to dismissal under Rule 12(b)(6) or whether contract invalidity is an affirmative defense more properly considered under Rule 56 or at trial. While the Federal [*22] Rules of Civil Procedure clearly govern this removed action, the the North Carolina Supreme Court has long held that

> [w]hen the complaint states a valid claim but also discloses an unconditional affirmative defense which defeats the asserted claim ... the motion will be granted and the action dismissed.

Skinner v. E. F. Hutton & Co., 314 N.C. 267, 270, 333 S.E.2d 236 (1985). Thus, the distinction between affirmative defense and failure to state a claim is one without consequence where, as here, defendants come forward with an unconditional affirmative defense derived from the Complaint. Clearly, plaintiff has not alleged in its Complaint that it was, at any time relevant to the contract it seeks to enforce, a licensed North Carolina real estate broker. It is undisputed that acting as a North Carolina real estate broker without a North Carolina license is a Class 1 misdemeanor. N.C. Gen. Stat. § 93A-8. North Carolina law specifically forbids enforcement of contracts involving criminal acts:

> If the statute, so construed, makes the doing of an act a criminal offense, one who has contracted to do the forbidden act may not, after performing his contract, sue

in the courts to recover the agreed consideration [*23] for such performance.

Raab & Co. v. Independence Corp., 9 N.C. App. 674, 677, 177 S.E.2d 337 (1970) (citations and corresponding quotation marks omitted). Even if the argument defendants make in the Motion to Dismiss were construed as an attempt to resolve an affirmative defense under Rule 12(b)(6) rather than at summary judgment or trial, North Carolina law makes it clear that the affirmative defense of illegality is unconditional and that plaintiff is attempting to have this court enforce a contract which is, on its face, not just invalid, but unlawful as a matter of criminal law.

The undersigned is compelled, therefore, to recommend that the First Cause of Action for Breach of Contract be dismissed.

**B. Tortious Interference With Contract**

Plaintiff next asserts a cause of action for tortious interference with contract. Although not served, Defendant Goldan moves to dismiss this claim because (1) a cause of action for tortious interference with an unlawful contract will not lie, (2) Mr. Goldan is an officer either of the corporate defendant or one of the members of the contracting parties, and (3) no allegation is made that, as a corporate officer, he interfered with contract for his own personal rather [*24] than corporate gain.

The elements of tortious interference with contract are: "(1) the existence of a valid contract between plaintiff and a third party; (2) knowledge by defendant of the contract; (3) acts by defendant to intentionally induce the third party not to perform the contract; (4) defendant's acts were committed without justification; and (5) actual damage to the plaintiff." Barker v.Kimberly-Clark Corp., 136 N.C.App. 455, 462, 524 S.E.2d 821 (2000) (citing Childress v. Abeles, 240 N.C. 667, 674, 84 S.E.2d 176 (1954)). In this case, the cause of action for tortious interference with contract fails at both the first and third elements.

First, the cause of action fails as to the first element for the reasons discussed above concerning the invalidity of the contract.

Second, the cause of action fails because all of the allegations of the Complaint, when read together, reveals that Mr. Goldan was an officer of a contracting party or

an officer of a member of a contracting party, and there is simply no allegation that he induced any anyone other than his own business associates to not perform a contract that is patently unlawful. The apparent implausibility of Mr. Goldan being a stranger to the contract is made [*25] manifest by the allegations of plaintiff's Complaint, wherein it alleges that Mr. Goldan "can be served with process at Reprop Financial Mortgage Investors, LLC, . . . ." Compl., at ¶ 2. Further, plaintiff does not dispute or challenge the statement that Reprop Financial Mortgage Investors, LLC, is one of the members of RDLG, LLC. See Notice of Removal (#1), at ¶ 6(a).

Third, reading the pleadings in a light most favorable to plaintiff, it is possible that plaintiff is attempting to allege tortious inference with contract by a corporate insider, a claim which North Carolina common law recognizes. The pleading requirements for tortious interference by an "insider" are applicable:

In the context of interference with contract by an insider, however, the element that the defendant acted without justification is potentially vitiated by the defendant's corporate position. Officers, directors, shareholders, and other corporate fiduciaries have a "qualified privilege to interfere with contractual relations between the corporation and a third party." "The acts or a corporate officer in inducing his company to sever contractual relations with a third party are presumed to have been done in the [*26] interest of the corporation."

Embree Constr. Group, Inc. v. Rafcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916 (1992)(internal citations omitted). To survive Rule 12(b)(6) in this context, however, plaintiff must allege facts that when taken as true could plausibly lead a finder of fact to conclude that the actions taken were for such defendant's *personal* rather than corporate interests. Id., at 499. The Complaint is silent as to what personal motivations Mr. Goldan had or even might have had in allegedly interfering with the marketing agreement.

For these reasons, the undersigned must recommend that the Motion to Dismiss the Second Cause of Action for tortious interference with contract be granted, and that this claim be dismissed.

## C. Defamation

In its third cause of action, plaintiff asserts a claim for defamation. There are two separate torts encompassed by the term "defamation," those being libel and slander.

> Generally, "libel is written while slander is oral." "[W]hen defamatory words are spoken with the intent that the words be reduced to writing, and the words are in fact written, the publication is both slander and libel."

Gaunt v. Pittaway, 135 N.C.App. 442, 447, 520 S.E.2d 603 (1999)(citations omitted). In this [*27] case, plaintiff contends that Mr. Goldan, "individually and on behalf of RDLG, has slandered and otherwise disparaged RPM with false statements concerning . . . the professionalism, abilities, honesty, and integrity of RPM." Compl., at ¶ 26. Thus, it appears that plaintiff's claim is limited to slander.

The elements of slander are that a statement (1) was made to a third person and (2) that such statement was false. Andrews v. Elliot, 109 N.C. App. 271, 426 S.E.2d 430, 432 (N.C. Ct. App. 1993). A slander *per se* occurs

> when considered alone without explanatory circumstances [the statement] (1) charges that a person has committed an infamous crime... (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace.

Gaunt, 135 N.C.App. at 448 (citation omitted).

The problems identified in the motion to dismiss are that plaintiff has failed to allege the identities of the third parties to whom the statements were made (publication) and the content of the allegedly tortuous statements. First, because plaintiff must prove that the allegedly defamatory statements were made to third parties, West v. King's Dept. Store, Inc., 321 N.C. 698, 703, 365 S.E.2d 621 (1988), [*28] failure to allege plausible facts upon which a jury could find in plaintiff's favor on that element is fatal to the claim. Iqbal, supra. Further, plaintiff makes no attempt through amendment to identify those third parties. See Fed.R.Civ.P. 15(a)(1)(B). Instead, it simply argues the existence of such facts can be surmised through inference. Such inference is not warranted by

these pleadings inasmuch as plaintiff fails to even allege the statements were made to third parties, much less their names.

Second, because plaintiff has failed to allege the content of the statements - - other than legal conclusions as to the nature of the statements - - the court cannot effectively execute its gatekeeper responsibilities under North Carolina law. As Judge Voorhees found in another case,

> [t]he alleged defamatory statement or statements made or published by the defendant need not be set out verbatim in plaintiff's defamation complaint if alleged substantially *in haec verba*, or with sufficient particularity to enable the court to determine whether the statement was defamatory.

Mkt. Choice, Inc. v. New Eng. Coffee Co., 2009 U.S. Dist. LEXIS 73627, 2009 WL 2590651, 5 (W.D.N.C. Aug. 18, 2009)(Voorhees, J.)(citations and corresponding [*29] quotation marks omitted).[8] The district court further held that

> the proper standard for assessing the legal sufficiency of a claim for defamation focuses on the requirements of Rule 8(a). Under this standard, the complaint must allege enough facts to demonstrate that the claim is plausible on its face.

Id. (citations omitted). The court simply cannot discern what was said to whom under what circumstances, all of which would have enabled the court to determine whether plaintiff has alleged a plausible claim. Plaintiff's reliance on inferences to be drawn from what is clearly an insufficient claim, rather than simply amend the claim to allege to whom such statements were made and include some description of the statements *in haec verba*, makes the claim insufficient under Rule 8(a). See Fed.R.Civ.P. 15(a)(1)(B).

> 8 Due to the limits of Electronic Case Filing, a copy of such unpublished decision is placed in the electronic docket through incorporation of the Westlaw citation.

The undersigned will therefore recommend that the third cause of action be dismissed in accordance with

Rule 12(b)(6) inasmuch as plaintiff has failed to allege enough facts to demonstrate that the claim is plausible on [*30] its face.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that

(1) defendants' Rule 12(b)(5) Motion to Dismiss (#30) the claims against Defendant Goldan be **DENIED**; and

(2) defendants' Rule 12(b)(6) Motion to Dismiss (#30) the Complaint in its entirety be **ALLOWED**, and that Complaint in 1:10cv233 be **DISMISSED** in its entirety for the reasons discussed above.

### <u>Time for Objections</u>

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

Signed: December 21, 2010

/s/ Dennis L. Howell

Dennis L. Howell

United States Magistrate Judge



**DIARIO EL PAIS, S.L. and PRISACOM, S.A., Plaintiffs, against THE NIELSEN COMPANY, (US), INC., Defendant.**

**07CV11295(HB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2008 U.S. Dist. LEXIS 92987**

**November 6, 2008, Decided**
**November 6, 2008, Filed**

**COUNSEL:** [*1] For Diario Pais, S.L., Prisacom, S.A., Plaintiffs: William O. Purcell, LEAD ATTORNEY, K&L Gates LLP(NYC), New York, NY.

For The Nielsen Company (US), Inc., Defendant: Aidan John Synnott, William James Taylor, Jr., Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY), New York, NY.

**JUDGES:** Hon. Harold Baer, Jr., United States District Judge.

**OPINION BY:** Harold Baer, Jr.

**OPINION**

**OPINION AND ORDER**

    **Hon. HAROLD BAER, JR., District Judge**:

    Plaintiffs Diario El Pais, S.L. and Prisacom, S.A. filed an amended complaint on April 3, 2008 charging Defendant The Nielsen Company, (US), Inc. with trade libel, tortious interference with economic prospects, negligent interference with economic prospects, and negligent misrepresentation for lost advertising revenue resulting from the publication of allegedly erroneous estimates of the number of visitors to Plaintiffs' elpais.com website in 2007. Plaintiff El Pais is a leading Spanish newspaper and Prisacom is the owner of the

online version of El Pais; both are based in Madrid. Defendant Nielsen is a New York corporation and one of several subsidiaries of a Dutch corporation that together provide audience measurement and business media products. In its motion to dismiss, Defendant raises [*2] the following arguments: (1) that Netratings Spain, S.L. Unipersonal ("Netratings"), a Spanish corporation and distant affiliate of Defendant, provided the allegedly erroneous information pursuant to a contract with Prisacom and is thus the proper defendant here; (2) that Plaintiffs' claims are contract claims improperly cast as tort claims; and (3) even if Defendant did owe Plaintiffs an independent duty not covered by the contract, the allegedly libelous speech is protected by the First Amendment. For the reasons discussed below, Defendant's motion to dismiss is granted.

**I. FACTS**

    El Pais owns and publishes *El Pais*, which is Spain's most widely read newspaper, and Prisacom controls and operates various websites including the digital version of *El Pais*, elpais.com. Am. Compl. P 1. Plaintiffs allege that the Defendant Nielsen is the world's leading provider of audience measurement services and that, through Nielsen Net Ratings or "NNR," it is the leading provider of online audience estimates in Spain. Id. at PP 2, 24, 26. Such online audience estimates are generated from a sample of users (a "NNR Panel") whose internet activity is tracked to form the raw data that Nielsen uses to

produce, [*3] via a proprietary methodology, reports that purport to rank the most popular websites in a geographic area based on the number of "unique users" that view the website each month. Id. at PP 26, 27. To distinguish user-directed internet activity from automatic or computer-generated activity, the NNR methodology does not count automated "calls" to a website towards the site's ranking. [1] Id. at P 52.

> 1 Such automated "calls" can occur when a website subscribes to a "RSS feed" (RSS stands for "really simple syndication") to receive automatic updates (such as headlines) originating from a third party source (such as a media site like elpais.com). Am. Compl. PP 51-52. The website receiving the RSS feed will "call" the originating website automatically. Id.

Plaintiffs rely upon the rankings, describing them as the "currency" by which advertisers and their agencies allocate advertising spending. Id. at PP 29, 30. Plaintiffs do not allege that they have a contract with Defendant The Nielsen Company (US). Rather, they allege that Prisacom is one of the Defendant's numerous "clients" to whom Defendant publishes its audience estimates. Id. at P 28.

Prior to March 2007, the NNR Panel for Spain comprised [*4] 4,000 users who connected to the internet from their homes. Id. at P 38. Under this composition of the NNR Panel, elpais.com was ranked as the # 2 media website for most of the period between August 2006 and February 2007. Id. at PP 4, 47. In March 2007, the NNR Panel was increased from 4,000 to 16,000 home users and 1,000 workplace users were added; Plaintiffs also allege that at this time revisions were made to the methodology used to estimate unique visitors to a website. Id. at P 41. Plaintiff allege that in July 2007 Defendant reported that elpais.com was the # 1 website in Spain during the previous month. Id. at P 48. However, on September 21, 2007, three of Prisacom's competitors published news articles that claimed traffic to elpais.com had been erroneously inflated by automatic "calls" to elpais.com's RSS feed. Id. at P 51. [2] Plaintiffs allege that persons within "Defendant's NNR business unit" were the source of the information in the news articles. Id. at P 51.

> 2 Prisacom acknowledges that it maintains a RSS page but disputes that the RSS page could have caused a material overstatement of the unique users to elpais.com. Am. Compl. PP 52,

58.

That day, Prisacom contacted the [*5] Defendant for an explanation and Mr. Gustavo Nunez, Defendant's local general manager, confirmed that elpais.com data was being audited because of the high volume of traffic on the elpais.com RSS page. Id. at P 54. Mr. Nunez agreed not to publish any revised data for August 2007 until Prisacom had an opportunity to review the data and receive an explanation of the downward revisions of the estimated online audience. Id. at P 55. On September 24, 2007, Louise Ainsworth, Defendant's European Manager, affirmed this agreement. Id. at P 59.

Nonetheless, on September 25, 2007, online audience data for August that reflected the recalculation was temporarily published through the Netview service, though attempts were made to recall the published data on that date. Am. Compl. PP 60, 66; Decl. of Ethan E. Litwin, (April 30, 2008) ("Litwin Decl."), Ex. E. Elpais.com fell from the # 1 to the # 3 ranked Spanish website and its estimated audience was reduced by 1.8 million unique users from July 2007. Am. Compl. PP 9-10. The next day, Jonathan Carson, president of Nielsen Online in New York, wrote to Plaintiffs in Spain to confirm that the audience estimates in the NNR "NetView service" would be "live [*6] in the Spanish market" on September 27, 2007. Litwin Decl. Ex. E. Mr. Carson apologized that "the data went live temporarily" on September 25, 2007 before Prisacom had a chance to discuss the revised data with a member of the Nielsen team as had been agreed. Am. Compl. P 69; Litwin Decl. Exhibit E. Also on September 26, 2007 Defendant delivered a report to Prisacom titled "Elpais.com -- Correction of Reported Standard Metrics: March - July 2007" that explained the downward adjustments. Am. Compl. PP 70, 71. However, Plaintiffs, conducted their own analysis of the revised data in the report and determined that the report was "either materially incomplete and/or entirely without merit." Id. at P 16.

Plaintiffs allege that on November 1, 2007, Defendant published the September 2007 data, which showed again that elpais.com was ranked # 3. Id. at P 12. On November 28, 2007, Defendant published revised monthly data for the period March through July 2007 which reflected downward adjustments to elpais.com's estimated audience ranging from 24% to 34%. Id. at P 13.

## II. STANDARD OF REVIEW

Under Rule 12(b)(6), a complaint will be dismissed if there is a "failure to state a claim upon which relief [*7] can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007); see also ATSI Communications, Inc. v. Shaar Fund Ltd., 493 F.3d 87 (2d Cir. 2007). The Court must read the complaint generously, accepting the truth of and drawing all reasonable inferences from well-pleaded factual allegations. See Erickson v. Pardus, 551 U.S. 89, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007); York v. Ass'n of Bar of City of New York, 286 F.3d 122, 125 (2d Cir. 2002). However, the pleader may have to "amplify a claim with some factual allegations where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 158 (2d Cir. 2007). Bald assertions and legal conclusions, or legal conclusions masquerading as facts need not be accepted as true by the Court. See Twombly, 127 S. Ct. at 1966.

## III. DISCUSSION

Defendant argues first that this is a breach of contract case not a tort case, and that Netratings is the proper defendant, not The Nielsen Company. Defendant also challenges the sufficiency [*8] of Plaintiffs' tort allegations themselves under Rule 12(b)(6). Additionally, Defendant argues that the statements at issue here are protected by the free speech provisions of the United States and New York State Constitutions because they are opinions. [3]

3  Because there are sufficient grounds to grant Defendant's motion to dismiss, I need not address Defendant's alternative argument that the published audience estimates are opinion protected by the United States and New York Constitutions.

## A. The Nature of Plaintiffs Claims

Plaintiffs assert three tort claims against Nielsen based on allegations that Nielsen published inaccurate estimates of the number of unique users to the elpais.com website. Am. Compl. PP 76-99. Defendant argues that a "Service Contract" dated July 26, 2005 between Prisacom and NetRatings (see Decl. of William J. Taylor, Jr. (April 17, 2008) Ex. D "Prisacom/Netratings Contract")

(hereinafter the "Contract")) governs the matters in dispute here and that therefore Netratings, the Spanish corporation, is the proper defendant. [4]

4  Netratings is a wholly-owned subsidiary of Netratings Australia Pty Limited, which in turn is a distant subsidiary of Nielsen. (See Def.'s Mem. [*9] 3.)

A breach of contract claim cannot be considered a tort unless a legal duty independent of the contract itself has been violated. Clark-Fitzpatrick v. Long Island Rail Road, Co., 70 N.Y.2d 382, 516 N.E.2d 190, 193, 521 N.Y.S.2d 653 (N.Y. 1987); TD Waterhouse Investor Services, Inc. v. Integrated Fund Services, Inc., 01cv8986 (HB), 2003 U.S. Dist. LEXIS 70, 2003 WL 42013, at *13-14 (S.D.N.Y. Jan. 6, 2003). The independent legal duty to support a tort claim must "spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." Clark-Fitzpatrick, 516 N.E.2d at 193.

Therefore, if the rights, obligations and duties that form the factual predicate for Plaintiffs' tort claims are wholly encompassed by the Contract, this suit must be dismissed. Conversely, if Plaintiffs' claims are based on legal duties that arise from circumstances extraneous to the Contract and Plaintiffs' claims are otherwise properly pled, Defendant's motion to dismiss should be denied. Accordingly, the Court must consider the contents of the Contract to determine its scope and whether the conduct alleged by Plaintiffs is encompassed thereby.

The Court may properly consider the contents [*10] of the Contract in ruling upon the instant motion to dismiss. Cortec Industries, Inc. v. Sum Holding, L.P., 949 F.2d 42, 48 (2d Cir.1991); Sel-Leb Marketing, Inc. v. Dial Corp., 2002 U.S. Dist. LEXIS 15932, 2002 WL 1974056, 3 (S.D.N.Y. 2002) (noting the well settled rule that documents that are an integral part of the complaint and of which a plaintiff had knowledge my be considered on a motion to dismiss pursuant to Rule 12(b)(6)). "A plaintiff's careful avoidance of certain documents in its pleading does not make those documents any less integral to the complaint. Sel-Leb Marketing, 2002 U.S. Dist. LEXIS 15932, 2002 WL 1974056, 3 (citing Yak v. Bank Brussels Lambert, BBL (USA), 252 F.3d 127, 131 (2d Cir.2001)). In the 12(b)(6) context, however, a document integral to the complaint may be properly considered "only to determine what the document[] state[s]," and

"not to prove the truth of [its] contents." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (quoting Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir.1991).

**1. Scope of the Contract**.

The Contract recites that Prisacom is interested in adopting one of Netratings "Solutions" for purposes of measuring its websites." [5] Contract PP 2, 3. Specifically, pursuant to the Contract, Prisacom [*11] retained one of Netratings "Solutions" known as "Netview" which is "based on the NETRATINGS RDD Panel, which shows information about the entire internet market for the contracted countries [i.e. Spain]." Id. at PP 2.2, 5.2. Netview is accessible via a password-protected website owned by Netratings (termed a "Netratings Portal"). Id. at P1.3.

> 5   Under the Contract, the term "Solution" refers to "any system developed by Netratings composed of software, methodology, services and means of delivery of Information and Client Data." (Contract P 1.5.) Under the Contract "Information" includes "demographic and any other information" provided by Netratings "pursuant to this Contract and through its various Solutions referring to the use and/or behavior of the internet, computers, and advertising over the Internet." (Contract P1.2.)

The Contract grants Prisacom a non-exclusive license to use Netratings' proprietary intellectual property--i.e., Information made available through Netview--subject to certain terms and conditions of use. Namely, pursuant to Paragraph 6.2 of the Contract, Prisacom is authorized to, inter alia, (i) use the Information internally and (ii) disclose "in summarized form, limited [*12] excerpts of information to its advertising agencies and clients insofar as it may be necessary for the marketing of its own products and/or services."

The Contract also addresses the reliability or accuracy of the information provided via the Netview service. Pursuant to Paragraph 9.1, Netratings warrants "the proper functioning of the contracted services" and that the "the information compiled and delivered in the reports is generated in accordance with the methodologies used in each service, and that its reliability corresponds to the limitations of each of the sources." [6]

> 6   Paragraph 9.2 makes clear that Netratings denies all other warranties, whether express or implicit. Thus, Netratings warrants that its reports will be generated in a manner consistent with its methodologies subject to the limitations of its sources, but disclaims any implied warranty that its estimates are an accurate statement of actual internet usage.

Finally, the Contract addresses the scope of Netratings' liability in connection with provision of the contracted-for services. Specifically, Paragraph 9.3 provides that Netratings is not liable for any form of damages "resulting from agreements between [Prisacom] [*13] and a third party, or for claims from a third party . . . engendered by the use of the Solutions and the information they generate." Under Paragraph 9.4, "the total maximum liability of Netratings, under any circumstance" is limited to the amount Prisacom has actually paid under the Contract during the preceding twelve months.

Reading the Contract, it is evident that the Contract encompasses (1) Prisacom's use of Netratings' internet audience estimates to promote its website as an advertising venue; (2) the limited scope of Netratings' warranties as to the accuracy of the information and reports delivered via the Netview service; and (3) the limitations on Netratings' liability in the event of a breach of such warranties or claims of lost profits based upon agreements between Prisacom and third parties.

**2. Overlap Between the Contract and Plaintiffs' Tort Claims**

Plaintiffs' claims are fundamentally premised on the alleged inaccuracy of internet audience ratings that both parties agree were produced and published by some part of the Nielsen corporate family. Am. Compl. PP 81, 91, 96; Def.'s Mem. 7. Plaintiffs contend, however, that their claims are not barred by the Contract because it [*14] governs the "provision of Nielsen data to Prisacom" and this action "concern's Nielsen's provision of Nielsen data to third parties." Pls.' Opp'n. Mem. 8. But Plaintiffs fail to acknowledge that not only is the allegedly libelous "Nielsen data" precisely the type of intellectual property covered by the Contract, but the Contract's non-exclusive license of that intellectual property inherently contemplates that the information will be shared with other third-party licensees. Moreover, it is clear from the letter attached to Plaintiffs' Litwin Declaration that the

information was published through the NetView service--the very Netratings "Solution" retained by Prisacom pursuant to the Contract. Claims that the information was generated in a manner inconsistent with the Netratings' own methodologies are covered by the limited warranty set forth in Paragraph 9.1 (and subject to the damage limitations of Paragraph 9.3 and 9.4). Claims that the internet audience estimates are an inaccurate reflection of actual usage are precluded by Paragraph 9.2 which denies all other warranties whether express or implicit.

It is thus clear that the Contract encompasses the fundamental subject matter of [*15] Plaintiffs' claims. Accordingly, the range of conduct alleged in the Amended Complaint that may possibly "spring from circumstances extraneous to" the Contract and give rise to an "independent legal duty" is exceedingly narrow. Clark-Fitzpatrick, 516 N.E.2d at 193.

### 3. Defendant's Role

In an attempt to tie in Nielsen, Plaintiffs' call Prisacom a "client" of Nielsen because it publishes audience estimates to Prisacom. Am. Compl. P 28. But delivering such audience estimates is unequivocally provided for in the Contract. Plaintiffs fail to allege facts to support its conclusory assertion that Prisacom is a Nielsen "client" by virtue of anything other than the Contract.

Plaintiffs also attempt to blur the distinction between the corporate identities of Netratings and Defendant, but Plaintiffs have not pled allegations sufficient to "pierce the corporate veil." [7] In re Currency Conversion Fee Antitrust Litig., 265 F.Supp. 2d 385, 426-27 (S.D.N.Y. 2003) (noting that "purely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter ego liability"). Plaintiffs request that this Court take judicial notice of a portion of the Netratings' website that references the Nielsen [*16] Company and labels products such as Nielsen/NetRatings "brands" or "services" as opposed to separate corporate subsidiaries or affiliates. [8] (Pls.' Opp'n. Mem. 4-5; Litwin Aff., Exs. B-D.) Not only are Plaintiffs barred from amending their complaint through their brief in opposition to the instant motion to dismiss, La Salle Bank Nat'l Ass'n v. Citicorp Real Estate Inc. 2003 U.S. Dist. LEXIS 12043, 2003 WL 146148 at *4 (S.D.N.Y. 2003), but even if this Court were inclined to do as Plaintiffs request, the statements on Netratings' website are insufficient to overcome "the

presumption of separateness afforded to related corporations." De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2nd Cir.1996) (internal quotation omitted); see Christensen v. SBM Industries, Inc., 9 Fed.Appx. 52, 53 (2nd Cir. 2001) (under New York law, "[a] party seeking to pierce the corporate veil bears a heavy burden of demonstrating complete domination by the parent and that such domination was the instrument of fraud or otherwise resulted in inequitable consequences." (internal quotation omitted)). [9]

7    At oral argument, Plaintiffs disavowed any attempt to "pierce the corporate veil," arguing instead that The Neilsen Company was the "direct [*17] actor" and that the claims at issue are not covered by the Contract. (Hrg Tr. 14:23-25; 16: 1-4). However, because the bulk of the factual underpinnings of Plaintiffs' claims are encompassed by the Contract, Plaintiffs must pierce the veil for Defendant to be liable for such conduct.

8    The exhibit provided by Plaintiffs is dated at the time of briefing for this motion to dismiss, not at the time that the acts underlying the Complaint are alleged to have occurred.

9    Even though veil-piercing allegations benefit from the liberal pleading standards of Fed. R. Civ. Pro. 8(a), Textiles Network Ltd. v. DMC Enterprises, LLC, 2007 U.S. Dist. LEXIS 64247, 2007 WL 2460767, 2 (S.D.N.Y., 2007), Plaintiffs' Amended Complaint does not set forth any veil-piercing allegations because Plaintiffs elected to proceed against The Nielsen Company as a "direct actor" premised on their incorrect conclusion that the claims at issue here were not encompassed by the Contract.

When they filed their Complaint, Plaintiffs knew they had a contract with Netratings, not Defendant. If their true intent was to argue that Netratings was merely the alter ego of Defendant, Plaintiffs should have so-alleged in their Complaint. But to do so, Plaintiffs would [*18] have had to acknowledge the existence of the Contract and Plaintiffs, not surprisingly given their theory of the case, elected not to do so. Plaintiffs may not escape the plain terms of the Contract by recasting their claims as torts.

Finally, Plaintiffs attempt to reach Nielsen by their focus on the fact that after the "leaks" surfaced, a

European Manager of Nielsen promised that Nielsen would review the new numbers jointly with Prisacom before releasing the August estimates. Am. Compl. PP 54-59. Further, Plaintiffs point to the letter from Mr. Jonathan Carson, the International President of Nielsen Online in New York, to Prisacom in which Mr. Carson acknowledged the August estimates may have been prematurely published but insisted that the corrected numbers were accurate. Am. Compl. P 69. But such post hoc, corrective actions are not the allegedly tortious acts for which Plaintiffs seek relief. Plaintiffs' claims are based on allegations that inaccurate audience estimates were published, not that the estimates were prematurely published in breach of Defendant's oral assurances that Prisacom would be allowed to review them first.

Because Plaintiffs' claims are encompassed by the Contract [*19] and Plaintiffs have failed to allege either that Defendant has breached an independent legal duty extraneous to the Contract or that Netratings is merely the alter ego of Defendant, Plaintiffs have failed to state a claim for which relief may be granted under Rule 12(b)(6).

**B. Failure to State The Tort Claims**

Even if Plaintiffs' claims were not barred as encompassed by the Contract under the rule of Clark-Fitzpatrick, Plaintiffs' Amended Complaint fails to state a claim for which relief may be granted. Each of Plaintiffs' claims is addressed in turn.

**1. Trade Libel**:

There are four elements to a trade libel claim: (1) falsity of the alleged statements; (2) publication to a third person; (3) malice; and (4) special damages. Computech Int'l, Inc. v. Compaq Computer Corp., 2002 U.S. Dist. LEXIS 20307, 2002 WL 31398933, at *5 (S.D.N.Y. Oct. 24, 2002). Defendant argues that Plaintiffs failed to allege malice or meet the pleading requirements for special damages under FRCP 9(g). Def.'s Mem. 21.

The Plaintiffs fail to properly allege "actual malice," which is a required element when the party libeled is a public figure. See New York Times v. Sullivan, 376 U.S. 254, 280, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964); Celle v. Filipino Reporter Enterprises Inc. 209 F.3d 163, 177 (2d Cir. 2000). [*20] As owners and operators of media outlets, Prisacom and El Pais qualify as "public figures" and consequently must allege that Nielsen, also a media

company, acted with actual malice. Celle, 209 F.3d at 177. Actual malice requires proof that party making the statement had a subjective awareness of either the falsity or probable falsity of the defamatory statement, or acted with reckless disregard of its truth or falsity. Id. at 182-83. Actual malice must be pled with specificity. Themed Restaurants, Inc. v. Zagat Survey, LLC, 4 Misc. 3d 974, 781 N.Y.S.2d 441, 449 (N.Y. 2004).

Plaintiffs' conclusory and unsupported assertions that the Defendant knew the revised audience estimates were inaccurate are insufficient to meet the pleading requirements for actual malice. Moreover, even Plaintiffs' own allegations show that Netratings and Nielsen took actions to ensure that the revised audience estimates (about which Plaintiffs complain) were accurately computed in accordance with Netratings' methodology. According to the Amended Complaint, on September 21, 2007, the day that Plaintiffs' competitors published news articles about the revised audience estimates, Defendant's local general manager told Prisacom that [*21] "the elpais.com data was being audited due to a high percentage of traffic that had been observed on elpais.com's RSS page." [10] Am. Compl. P 54. The audit and Defendant's September 26, 2007 report belie a subjective belief that the resultant estimates (i.e. those published September 25, 2007 and thereafter) are accurate; such actions are clearly inconsistent with a "reckless disregard" for the truth.

> 10 Plaintiffs do not complain about the initial March - June 2007 estimates which showed elpais.com ascending to the # 1 spot, but which Netratings concluded improperly counted automatic calls to elpais.com's RSS page. (See Am. Compl. P 76.)

From the face of the Amended Complaint, Defendant's actions demonstrate a concerted effort to ensure that the published estimates were accurately calculated in accordance with Netratings' methodology. Whether the revised estimates misstate the actual number of unique users to elpais.com as Plaintiffs suggest is merely a difference of opinion as to whose methodology provides a more reliable estimate of actual internet traffic. But contentions that a different methodology would have produced a more accurate result do not amount to allegations that Defendant [*22] acted with actual malice when it published estimates that it had confirmed were consistent with its own methodology.

Plaintiffs fail to state a claim for trade libel because their Amended Complaint does not allege facts that render "plausible" the actual malice element of trade libel, Iqbal v. Hasty, 490 F.3d 143, 158 (2d Cir. 2007), let alone a set facts that satisfy the heightened pleading requirements for actual malice. Zagat Survey, 781 N.Y.S.2d at 449.

Therefore, Plaintiffs' claim for trade libel must be dismissed.

### 2. Tortious Interference with Prospective Economic Advantage [11]

> 11   There is no claim for negligent interference with prospective economic advantage under New York law. Bishop v. Porter, 2003 U.S. Dist. LEXIS 7625, 2003 WL 21032011, at *12 (S.D.N.Y. May 8, 2003).

Tortious interference claims have a limited scope and an extremely high pleading standard. Genal Strap v. Irit Dar, 2005 WL 525547, at *3 (E.D.N.Y. 2005). To render Plaintiffs' tortious interference claim "plausible," See Iqbal, 490 F.3d at 158 (2d Cir. 2007), Plaintiffs must provide some factual allegations that but-for Defendant's alleged acts, Plaintiffs would have entered into contracts with specific prospective advertisers or maintained [*23] consistent levels of advertising with their existing advertisers. See, School of Visual Arts v. Kuprewicz 3 Misc. 3d 278, 771 N.Y.S.2d 804, 813 (N.Y.Sup. 2003) ("It is well-settled that an essential element of [the intentional interference with prospective economic advantage] tort is that the plaintiff would have consummated a contract with another person but for the interference of the defendant"). Moreover, Plaintiffs must also allege that Defendant intentionally interfered with Plaintiffs' existing business relationships and acted solely out of malice or used dishonest, unfair, or other improper means. Henneberry v. Sumitomo Corp. of America, 415 F.Supp.2d 423, 467 (S.D.N.Y.,2006) (citing Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003)).

Plaintiffs allege that Nielsen intentionally published inaccurate and unreliable estimates of elpais.com's online audience to companies and advertising firms with whom Plaintiffs have or could have done business, damaging Plaintiffs' existing and prospective business relationships. Am. Compl. P 91. But Plaintiffs do not assert any factual allegations that, if true, would show that the inaccurate audience estimates were the "but-for" cause of damage to existing [*24] business relationships or loss of prospective ones.

Moreover, even if Plaintiffs have sufficiently alleged that Nielsen intended to publish inaccurate estimates (a contention clearly undermined by Plaintiffs' allegations about Defendant's audit and other efforts to ensure the accuracy of published estimates), Plaintiffs have not made allegations that suggest the estimates were published with an intent to interfere with Plaintiffs' business relationships. With respect to the "intent to interfere" or "improper means" element of the tort, Plaintiffs sole factual allegations relate to the timing of Defendant's release of its estimates--that Defendant's "leaked" the revised statistical estimates to Plaintiffs' competitors and then published them before Plaintiffs had an opportunity to comment. But Plaintiffs' tortious interference claim stems from the alleged inaccuracy of the estimates, not the timing of their release. Plaintiffs do not offer any allegation that, if true, would show Defendant deliberately or improperly produced inaccurate audience estimates to interfere with Plaintiffs' advertising business. Therefore, Plaintiffs' claim for tortious interference with prospective economic [*25] advantage must be dismissed.

### 3. Negligent Misrepresentation

Under New York law, a claim of negligent misrepresentation lies where (1) the defendant had a duty, as a result of a special relationship, to give correct information, (2) the defendant made a false representation that he or she should have known was incorrect, (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose, (4) the plaintiff intended to rely and act upon it, and (5) the plaintiff reasonably relied on it to his or her detriment. Henneberry, 532 F. Supp. 2d 523.

Allegations of negligent misrepresentation must comply with the particularity requirements of Fed. R. Civ. P. 9(b). Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 583 (2nd Cir. 2005); Phoenix Four, Inc. v. Strategic Res. Corp., 05 CV 4837 (HB) 2006 U.S. Dist. LEXIS 6512, 2006 WL 399396, *10 (S.D.N.Y. Feb. 21, 2006). Rule 9(b) requires the specific pleading of "facts that 'give rise to a strong inference' that the defendants had an intent to defraud, knowledge of the falsity or a reckless disregard for the truth." Henneberry, 532 F. Supp. 2d at 542. The inference may be established either (a) by [*26] alleging facts that show that defendants had both motive and opportunity to commit

fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Id.

Plaintiffs fail to allege facts to support such an inference. First, Plaintiffs fail to make any allegations that Defendant had a motive to publish inaccurate audience estimates or to favor Plaintiffs' competitors. To the contrary, Defendant has a strong motivation to ensure the accuracy of the estimates that are its primary product and, in Plaintiffs' words, the "currency" of the internet advertising industry. Second, Plaintiffs allege no facts that are strong circumstantial evidence of conscious misbehavior or recklessness. From the face of Plaintiffs' Amended Complaint it is clear that Defendant and Netratings audited their data and analyzed it to ensure that the estimates were generated in accordance with their methodologies.

A claim of negligent misrepresentation also requires a special relationship of trust or confidence between the parties. Henneberry, 532 F. Supp. 2d at 538. Plaintiffs fail to sufficiently allege such a special relationship whether or not the Contract governs [*27] the business relationship between Prisacom and Nielsen; courts have routinely held that an arms-length commercial transaction, without more, does not give rise to a special duty to speak with care. Id. at 539 (citing Kimmell v. Schaefer, 89 N.Y.2d 257, 652 N.Y.S.2d 715, 718, 675 N.E.2d 450 (1996)). Plaintiffs have not alleged that Defendant did anything other than what Netratings was obligated to do by the Contract: namely, provide internet usage data and estimates in accordance with Netratings' proprietary methodologies. And even if the Contract does not govern the relationship between Plaintiffs and Nielsen, Plaintiffs have not provided factual allegations that support an inference that the relationship was anything more than an arms-length. Moreover, Plaintiffs cannot claim that this is a case where a party "wholly without knowledge seek[s] assurances from one with exclusive knowledge" Heard v. City of New York, 82 N.Y.2d 66, 623 N.E.2d 541, 603 N.Y.S.2d 414 (1993) because Plaintiffs' own internet audience estimates show that Defendant is not the exclusive holder of specialized knowledge about how to estimate internet traffic. Thus, the claim for negligent misrepresentation must be dismissed.

**IV. CONCLUSION**

For the reasons stated above, the Defendant's [*28] motion to dismiss the complaint is granted. The Clerk of the Court is instructed to close the case and any open motions and remove it from my docket.

**SO ORDERED**

**New York, New York**

**November 6, 2008**

/s/ Harold Baer, Jr

**U.S.D.J.**



ERIC ESANCY, Plaintiff, vs. JAMES T. QUINN, Defendant

CIVIL DOCKET NO.: 5:05CV26

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA, STATESVILLE DIVISION

2006 U.S. Dist. LEXIS 8479

February 10, 2006, Decided

**COUNSEL:** [*1] For Eric Esancy, Plaintiff: C. Gary Triggs, C. Gary Triggs, P. A., Morganton, NC.

For James T. Quinn, Defendant: Clisby Hall Barrow, Walker, Bryant, Tipps & Malone, Nashville, TN, US.

**JUDGES:** Richard L. Voorhees, Chief United States District Judge.

**OPINION BY:** Richard L. Voorhees

**OPINION**

**ORDER**

   **THIS MATTER** is before the Court on Defendant's "Motion to Dismiss Plaintiff's Defamation Claims" and "Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiff's Defamation Claims," both filed September 30, 2005. [Documents ## 21, 22]. Plaintiff did not file a Response. This Motion is now ripe for disposition by the Court.

   Having carefully considered the arguments of the parties, the record, and the applicable authority, the Court will grant Defendant's Motion to Dismiss.

**I. FACTUAL AND PROCEDURAL HISTORY**

   For purposes of this Motion to Dismiss, the Court accepts the following facts derived from Plaintiff's Amended Complaint as true. *See Darcangelo v. Verizon*

*Commc'ns, Inc.,* 292 F.3d 181, 189 (4th Cir. 2002) (noting that "at the motion to dismiss stage, a court must accept the allegations in the complaint as true and view the complaint in the light [*2] most favorable to the plaintiff").

   Plaintiff Eric Esancy ("Plaintiff" or "Esancy") is involved in various businesses, including financial management companies, dealing primarily with banks and banking institutions. (Am. Compl. P 6). One such banking institution with whom Plaintiff worked was the Bank of Granite. (*Id.* P 22).

   Defendant James Quinn ("Defendant" or "Quinn") was formerly an employee or agent of Private Business, Inc. ("PBI"), which is a corporation engaged in business enterprises similar to those engaged in by Plaintiff. (*Id.* P 8). In October 2003, Plaintiff became involved in a business relationship with PBI, which resulted in Plaintiff having business dealings with Defendant, the Chief Sales Officer of PBI. [1] (*Id.* P 10).

   > 1   The Court is still unsure what these business deals entailed or in what capacity Plaintiff served during these deals because Plaintiff's Amended Complaint still lacks specificity in that regard.

   Sometime in the late summer or fall of 2003, Plaintiff entered into [*3] a contract with Jeff DeWald, who worked for a business named Adpro. (*Id.* P 15). Adpro was a bank product being presented to banks and strategic partners within the industry. (*Id.*). Plaintiff was

to assist in the promotion of Adpro. (*Id.*). Plaintiff introduced PBI to Adpro in order to negotiate sales and deliver sales relationships to PBI. (*Id.* PP 15, 16). In return, Plaintiff was to receive performance-based compensation. (*Id.* P 16). After introducing Adpro to PBI, Adpro terminated its relationship with Plaintiff and directly entered into an agreement with PBI, which effectively eliminated Plaintiff's opportunity for compensation. (*Id.* P 17). The termination of the business relationship between Adpro and Plaintiff was based in whole or part upon false, negative, and misleading statements made by Defendant individually and in his capacity as an agent for PBI. (*Id.* P 19).

In late February or early March of 2004, Defendant, acting as an agent for PBI, called Plaintiff and accused him of past negative performance. (*Id.* P 11). Defendant further advised Plaintiff of a conversation Defendant had with John Gabriel, Senior Vice-President of the Bank of Granite. [*4] Specifically, Defendant told Plaintiff that during his conversation, Defendant told Mr. Gabriel that Plaintiff had a terrible reputation within the industry and created bad situations at various banks, with which he had been associated and which required the Defendant to cleanup after Plaintiff. (*Id.* P 22(A)). Defendant further allegedly advised Mr. Gabriel that Plaintiff's failure to properly supervise his accounts had resulted in Plaintiff losing PBI's business. (*Id.* P 22(B)). Defendant also stated that Plaintiff's reputation with various banks, including the Bank of Granite, was very poor. (*Id.* P 22(C)). Mr. Gabriel responded by allegedly telling Defendant that the Bank of Granite was dissatisfied with Plaintiff's performance, which resulted in the Bank terminating its contract with PBI. (*Id.* P 12).

After being advised of the purported conversations between Defendant and Mr. Gabriel, Plaintiff personally contacted Mr. Gabriel, who orally and in writing denied ever having such conversations with Defendant and, in fact, indicated that at all times he was satisfied with the way Plaintiff handled his business relationship with the Bank. (*Id.* P 13).

Defendant also [*5] made the same or similar statements as purportedly discussed with Mr. Gabriel to other customers or entities with whom Plaintiff was involved, with the intent to defame Plaintiff's good character. (*Id.* PP 23, 24). Moreover, Defendant sent one or more of his employees to various banks, including the Bank of Granite, to ask questions about their involvement with Plaintiff in order to discover negative information that could be used or disseminated by Defendant to promote his interests over Plaintiff's. (*Id.* P 25). Despite knowing that the statements, accusations, or innuendo regarding Plaintiff were false, Defendant persisted in his efforts to demean Plaintiff's character and reputation in order to prohibit Plaintiff from directly competing with Defendant. (*Id.* P 27). Plaintiff further maintains that "the Defendant utilizing his position as an officer with PBI sought to protect his personal interest by systematically attempting to undermine the credibility of the Plaintiff through the making of false and demeaning statements which he knew or by reasonable diligence should have known, were untrue." (*Id.* P 14).

Based on these facts, on January 26, 2005, Plaintiff filed [*6] a Complaint in the Superior Court Division of Iredell County, seeking to recover compensatory and punitive damages, as well as attorney's fees, for defamation of character, fraud/misrepresentation, tortious interference with contract, unfair and deceptive trade practices, and civil conspiracy. On February 25, 2005, Defendant removed the action to this Court. Subsequently, on March 1, 2005, Defendant filed a Motion to Dismiss and Motion for More Definite Statement. In an Order dated July 21, 2005, the Court: (1) granted Defendant's Motion to Dismiss Plaintiff's fraud/misrepresentation claim; (2) granted Defendant's Motion to Dismiss Plaintiff's unfair and deceptive trade practices claim with regard to Defendant's alleged *deceptive* acts; and (3) granted Defendant's Motion for More Definite Statement and gave Plaintiff thirty days to submit a more definite statement of allegations supporting both his unfair trade practices claim and Plaintiff's defamation claim. In accordance with this Order, on August 19, 2005, Plaintiff filed an Amended Complaint, alleging claims for defamation of character, tortious interference with contract, unfair and deceptive trade practices, and civil conspiracy.

[*7] **II. DISCUSSION**

Defendant now moves to dismiss Plaintiff's defamation claim, arguing that Plaintiff's allegations are insufficient to maintain a cause of action for defamation. As noted above, Plaintiff did not respond to Defendant's Motion to Dismiss.

**A. Standard of Review**

The purpose of a Rule 12(b)(6) motion is to test the

legal sufficiency of a plaintiff's complaint. *Suarez v. Charlotte-Mecklenburg Schs.,* 123 F. Supp. 2d 883, 885-86 (W.D.N.C. 2000) (citing *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). In considering a Rule 12(b)(6) motion to dismiss, the court must take the allegations in the complaint as true and construe the facts alleged in the complaint in the light most favorable to the plaintiff. *GE Inv. Private Placement v. Parker,* 247 F.3d 543, 548 (4th Cir. 2001). "[Dismissal may occur] only if it appears beyond doubt that the plaintiff[] can prove no set of facts in support of [her] claim that would entitle [her] to relief." *Jackson v. Blue Dolphin Commc'ns of N.C., L.L.C.,* 226 F. Supp. 2d 785, 788-89 (W.D.N.C. 2002) (brackets in original) (quoting [*8] *Flood v. New Hanover County,* 125 F.3d 249, 251 (4th Cir. 1997)).

To survive a Rule 12(b)(6) motion, "a complaint need only outline a recognized legal or equitable claim which sufficiently pinpoints the time, place, and circumstances of the alleged occurrence and which, if proven, will justify some form of relief." *Jackson,* 226 F. Supp. 2d at 789 (citation omitted). A motion to dismiss is not limited to claims of law which are obviously unsupportable; rather if, as a matter of law, it is obvious that no relief could be granted under any set of facts alleged by the plaintiff, the claim must be dismissed. *Id.* (quoting *Neitzke v. Williams,* 490 U.S. 319, 326-27, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989)).

Significantly, although a court must accept as true all material factual allegations in the complaint, the court does not need to accept a plaintiff's "conclusory allegations regarding the legal effect of the facts alleged." *Labram v. Havel,* 43 F.3d 918, 921 (4th Cir. 1995). In sum, "dismissal under Rule 12(b)(6) is proper when on its face the complaint reveals either no law supports the plaintiff's claim or the absence of fact sufficient [*9] to make a good claim, or when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Andrews v. Elliot,* 109 N.C. App. 271, 274, 426 S.E.2d 430, 432 (1993).

**B. Pleading Defamation**

"The term defamation includes two distinct torts, libel and slander. In general, libel is written while slander is oral.'" *Iadanza v. Harper,* 169 N.C. App. 776, 781, 611 S.E.2d 217, 222 (2005) (quoting *Tallent v. Blake,* 57 N.C. App. 249, 251, 291 S.E.2d 336, 338 (1982)). To prevail

on a defamation claim, a plaintiff must allege and prove that the defendant made a false and defamatory statement of or concerning the plaintiff, which was published to a third person, and caused injury to the plaintiff's reputation. *Smith-Price v. Charter Behavioral Health Sys.,* 164 N.C. App. 349, 356, 595 S.E.2d 778, 783 (2004) (quoting *Tyson v. L 'Eggs Prods., Inc.,* 84 N.C. App. 1, 10-11, 351 S.E.2d 834, 840 (1987)). "To be actionable, a defamatory statement must be false and must be communicated to a person or persons other than the person defamed." *Andrews,* 109 N.C. App. at 274, 426 S.E.2d at 432. [*10]

When pleading a defamation claim, the alleged defamatory statement made or published by the defendant does not have to be set out verbatim in the plaintiff's complaint if alleged "'substantially *in haec verba,* or with sufficient particularity to enable the court to determine whether the statement was defamatory.'" *Id.* (quoting *Stutts v. Duke Power Co.,* 47 N.C. App. 76, 83-84, 266 S.E.2d 861, 866 (1980)). Moreover, allegations of time and place are material for purposes of testing the sufficiency of a pleading and, therefore, should be plead in the complaint. FED. R. CIV. P. 9(f); *see also Stutts,* 47 N.C. App. at 83, 266 S.E.2d at 866 (finding that use of the date "September 10, 1976" satisfied the time requirement and allegation of "the McGuire Nuclear Construction Project" was sufficient for the place requirement of Rule 9(f)).

**C. Plaintiff's Allegations of Defamation**

As noted above, Plaintiff claims that Defendant defamed him to John Gabriel of the Bank of Granite, as well as to "various other customers or entities with which Plaintiff was involved." (Am. Compl. PP 20-27).

**1. Defendant's** [*11] **statements to John Gabriel**

Plaintiff contends that during a conversation with Defendant in February or March of 2004, Defendant advised Plaintiff that during his conversations with John Gabriel of the Bank of Granite, Defendant told Mr. Gabriel that Plaintiff had a terrible reputation within the industry, that Plaintiff created bad situations in various banks, and Plaintiff's failure to properly supervise his accounts resulted in a loss of business by PBI. (Am. Compl. PP 11, 12, 22). Plaintiff then admits that he contacted Mr. Gabriel directly, and Mr. Gabriel orally and in writing denied ever having any such conversations

with Defendant. (*Id.* PP 13, 22(C)). Moreover, Plaintiff admits in his Amended Complaint that Defendant never made the alleged defamatory statements to Mr. Gabriel. (*See* Am Compl. P 22(C)) (alleging ". . . when asked specifically what banks the Defendant was referring to, he refused at first to tell the Plaintiff, but then advised the Plaintiff about *purported* conversations that had taken place with John Gabriel at the Bank of Granite, *which the Plaintiff now knows were false*") (emphasis added). As noted above, to sufficiently allege a defamation [*12] claim, Plaintiff must allege that the false, defamatory statements were published to a third party. *Andrews,* 109 N.C. App. at 274, 426 S.E.2d at 432. Since Plaintiff admits that Defendant never made any of the alleged defamatory statements to Mr. Gabriel, Plaintiff has not sufficiently pled a defamation claim. [2]

> 2    The Court notes that Plaintiff's Amended Complaint provides inconsistent statements, in that Plaintiff first alleges that Defendant made defamatory comments to Mr. Gabriel but then immediately admits that such statements did not occur. However, since Plaintiff was given an opportunity to amend his Complaint to more clearly allege his defamation claim and in light of Plaintiff's failure to file a Response to Defendant's Motion to Dismiss to explain these inconsistent statements, dismissal of Count One with regard to the "purported" statements made by Defendant to Mr. Gabriel is appropriate.

Additionally, although Plaintiff alleged the time and place when he was made aware of the alleged [*13] defamatory statements - in February or March of 2004, during a phone conversation with Defendant - Plaintiff has failed to allege the date on which the alleged defamatory statements were communicated from Defendant to Mr. Gabriel. (Am. Compl. PP 11-13, 22). In order to properly plead a defamation claim, Plaintiff must state the time and place of the alleged defamatory communication. FED. R. CIV. P. 9(f).

In sum, since Plaintiff admits that Defendant never made the alleged defamatory statements to Mr. Gabriel

and in light of Plaintiff's failure to state the time and place of any such alleged defamatory statements, the Court finds that dismissal of Plaintiff's defamation claim with regard to the alleged statements made by Defendant to Mr. Gabriel is proper.

**2. Defendant's statements to "other customers or entities"**

Plaintiff further alleges that "the Defendant made the same of [sic] similar statements as set forth above to various other customers or entities with which the Plaintiff was involved, including but not limited to the Bank of Granite, with the clear intention to defame the good character of the Plaintiff." (Am. Compl. P [*14] 23). Significantly, Plaintiff does not allege the specific individuals to whom the alleged defamatory statements were made, nor does he allege the time or place of the defamatory communications. Although Plaintiff is not required to set out verbatim the defamatory statements, in order to overcome a Rule 12(b)(6) motion, at a minimum, Plaintiff must include the third-party to whom the statements were made, as well as the time and place of the communication. *Andrews,* 109 N.C. App. at 274, 426 S.E.2d at 432; FED. R. CIV. P. 9(f); *Stutts,* 47 N.C. App. at 83, 266 S.E.2d at 866. Therefore, Plaintiff's allegations in support of his defamation claim with regard to statements made by Defendant to "various other customers or entities with which the Plaintiff was involved" are insufficient to overcome Defendant's Motion to Dismiss.

**III. CONCLUSION**

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Dismiss Plaintiff's Defamation Claims is hereby **GRANTED.** Count One of Plaintiff's Amended Complaint is hereby **DISMISSED WITH PREJUDICE.**

Signed: February 10, 2006

Richard L. Voorhees

Chief United States [*15] District Judge



**GARY HAYLASH, Plaintiff, v. VOLVO TRUCKS NORTH AMERICA, INC., a/k/a VOLVO TRUCK OF NORTH CAROLINA, INC., Defendant.**

**CIVIL NO. 1:97CV01135**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA, DURHAM DIVISION**

**1998 U.S. Dist. LEXIS 12511**

**April 10, 1998, Decided**
**April 10, 1998, Filed**

**DISPOSITION:** [*1] Defendant Volvo Trucks North America, Inc.'s motion to dismiss [Doc. # 9] the Second Claim for Relief and the Third, Fourth, and Fifth Causes of Action in Plaintiff's amended complaint GRANTED, and the Second Claim for Relief and the Third, Fourth, and Fifth Causes of Action in Plaintiff's amended complaint DISMISSED.

**COUNSEL:** For GARY HAYLASH, plaintiff: NANCY PULLIAM QUINN, THE QUINN LAW FIRM, GREENSBORO, NC.

For VOLVO TRUCKS NORTH AMERICA, INC., defendant: JULIANNA COCHRAN THEALL, MARTIN N. ERWIN, SMITH HELMS MULLISS & MOORE, GREENSBORO, NC.

For VOLVO TRUCKS NORTH AMERICA, INC., defendant: MICHAEL F. MARINO, FREDERIC FREILICHER, REED SMITH SHAW & MCCLAY, MCLEAN, VA.

**JUDGES:** Frank W. Bullock, Jr., United States District Judge.

**OPINION BY:** Frank W. Bullock, Jr.

**OPINION**

*MEMORANDUM OPINION*

BULLOCK, Chief Judge

This matter is before the court on Defendant Volvo Trucks North America, Inc.'s ("Volvo") motion to dismiss the Second Claim for Relief and the Third, Fourth, and Fifth Causes of Action in Plaintiff's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons the court will grant Volvo's motion.

FACTS

In assessing whether [*2] Plaintiff's amended complaint fails to state a claim upon which relief can be granted, Plaintiff's factual allegations are taken as true.

Plaintiff, a former at-will employee of Volvo, suffers from a disabling condition in his back and also suffers from depression. Plaintiff's wife suffers from multiple sclerosis. Plaintiff alleges that his employment relationship with Volvo began to deteriorate in 1995 when his wife began experiencing an increase in her symptoms of multiple sclerosis, which required more of Plaintiff's time and attention. Plaintiff further alleges that Volvo refused his requested accommodation with respect to intermittent medical leave and flexibility in work times when necessary to coordinate nursing care arrangements for his wife. Finally, Plaintiff alleges Volvo terminated

him in September 1996 because of his disability.

On January 27, 1997, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging handicap discrimination in the decision to terminate his employment from Volvo. After receiving a right-to-sue letter from the EEOC, Plaintiff initiated this action alleging a violation of the Americans with Disabilities Act ("ADA"), [*3] 42 U.S.C. § 12101 *et seq.*, as well as state Law claims for breach of the covenant of good faith and fair dealing, punitive damages, intentional and/or negligent infliction of emotional distress, and equitable relief.

DISCUSSION

Dismissal under Rule 12(b)(6) is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). In considering a motion to dismiss, the court accepts as true all well-pleaded allegations and views the complaint in a light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

Volvo first attacks Plaintiff's Second Claim for Relief, which alleges that Volvo breached the implied covenant of good faith and fair dealing by terminating him in bad faith. It is well settled that North Carolina law does not recognize a separate claim for wrongful discharge in bad faith. *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 360, 416 S.E.2d 166, 173 (1992). Accordingly, the court will dismiss Plaintiff's Second Claim for Relief.

Next, Volvo moves for dismissal [*4] of Plaintiff's Fourth Cause of Action, which asserts a claim for intentional and/or negligent infliction of emotional distress. Volvo contends that the amended complaint fails to allege conduct sufficiently extreme and outrageous to state a claim for emotional distress. The court agrees.

Under North Carolina law, in order to maintain an action for intentional infliction of emotional distress, one must prove: (1) extreme and outrageous conduct (2) which is intended to cause and does cause (3) severe emotional distress. *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981). A claim for negligent infliction of emotional distress requires a plaintiff to establish that: (1) the defendant engaged in negligent conduct, (2) it was

reasonably foreseeable that such conduct would cause the plaintiff to suffer severe emotional distress, and (3) the conduct did in fact cause the plaintiff to suffer severe emotional distress. *Johnson v. Ruark Obstetrics and Gynecology Assocs., P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). The emerging view under North Carolina law is that the same level of extreme and outrageous conduct must be present in both negligent and intentional infliction [*5] claims. *See Lorbacher v. Housing Auth. of Raleigh*, 127 N.C. App. 663, 493 S.E.2d 74, 82 (1997) (affirming trial court's dismissal of intentional infliction of emotional distress claim and negligent infliction of emotional distress claim where plaintiff failed to allege conduct which rose to the extreme and outrageous level required under North Carolina law).

To establish extreme and outrageous conduct, a plaintiff must allege conduct which is "'so outrageous in character and so extreme in degree as to go beyond all possible grounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Briggs v. Rosenthal*, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311 (1985) (quoting *Restatement (Second) of Torts*, § 46, cmt. d). As a threshold matter, it is a question of law for the court to determine whether the conduct complained of may be reasonably found to be sufficiently outrageous to permit recovery. *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 490, 340 S.E.2d 116, 121 (1986) (citing to *Restatement (Second) of Torts*, § 46, cmt. h (1965)). If the conduct complained of could reasonably be regarded as extreme and outrageous, [*6] then the question of whether the conduct was sufficiently extreme and outrageous to result in liability is for the jury. *Id.*

Here, Plaintiff alleges that Volvo was aware of the disabilities affecting Plaintiff and his wife, failed to make reasonable accommodations for his disabilities and to permit a flexible work schedule so that he could coordinate nursing care for his wife, and terminated him because of his disability. Even assuming the truth of these allegations, Volvo's conduct does not rise to the level of extreme and outrageous conduct as contemplated by existing case law. For instance, in *Hogan*, one of the plaintiffs alleged that her supervisor cursed at her, refused to grant her a pregnancy leave of absence or to let her leave work to go to the hospital when she felt labor pains, and required her to carry heavy objects despite his knowledge of her physical condition. 79 N.C. App. at 494, 340 S.E.2d at 123. The court held that such conduct

"though unjustified under the circumstances apparent from [the plaintiff's] testimony, was not so 'extreme and outrageous' as to give rise to a claim for intentional infliction of emotional distress." *Id.; see also Lorbacher,* [*7] 493 S.E.2d at 82 (affirming dismissal of emotional distress claim where plaintiff alleged he was discharged to deflect responsibility for deaths which had occurred at housing units and because he had exercised his First Amendment rights and disclosed the defendant's negligent operations); *Trought v. Richardson*, 78 N.C. App. 758, 338 S.E.2d 617 (1986) (alleged termination without cause followed by false and malicious statements regarding reason for termination were insufficient to state a claim for intentional infliction of emotional distress).

The courts have adhered to this high threshold for outrageousness even where discriminatory intent is alleged. For example, the Fourth Circuit, applying North Carolina law, affirmed a district court's grant of summary judgment against an employee where the employee had alleged *inter alia* that the employer had arbitrarily transferred accounts from her to male employees, unnecessarily delayed and/or denied her orders and price quotes, secretly allowed her telephone messages to be used by male employees to obtain her prospective clients, and otherwise harassed and humiliated her. *Keziah v. W. M. Brown & Son, Inc.*, 888 F.2d 322, 326-26 [*8] (4th Cir. 1989). Similarly, a plaintiff's complaints that her supervisor "gave her too much work, required her to sweep and dust, and commented that blacks are slower than whites" did not amount to extreme and outrageous conduct. *Patterson v. McLean Credit Union*, 805 F.2d 1143, 1145-46 (4th Cir. 1986), *aff'd in part, vacated in part on other grounds*, 491 U.S. 164 (1989). Accordingly, the court will grant Volvo's motion to dismiss Plaintiff's Fourth Cause of Action.

Finally, the court turns to Plaintiff's Third Cause of Action and Fifth Cause of Action which assert claims for punitive damages and equitable relief, respectively. Punitive damages and equitable relief are not separate causes of action, but instead constitute requests for relief. *See, e.g., Shugar v. Guill*, 304 N.C. 332, 335, 283 S.E.2d 507, 509 (1981) (holding that a civil action may not be maintained solely for the purpose of collecting punitive damages but may be awarded only when a cause of action otherwise exists in which at least nominal damages are recoverable by the plaintiff). Accordingly, the court will dismiss Plaintiff's Third Cause of Action and Fifth Cause of Action, but will consider punitive [*9] damages and

equitable relief as part of Plaintiff's prayer for judgment in connection with his remaining claim under the ADA. [1]

> 1   The court disagrees with Volvo's contention that punitive damages are not available under the ADA for failing to make a reasonable accommodation to an employee with a disability. *See* Def.'s Reply at 4. The provision that Volvo relies upon, 42 U.S.C. § 1981a(a)(3) provides that:
>
>> damages may not be awarded . . . where the [defendant] demonstrates good faith efforts, in consultation with the person with the disability who has informed the [defendant] that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business.
>
> Here, however, Plaintiff has not alleged that Volvo made a good faith effort to accommodate his disability, but that Volvo intentionally failed to make a reasonable accommodation and that Volvo did so with malice or reckless indifference to Plaintiff's federally protected rights. If true, such allegations would entitle Plaintiff to recover punitive damages under the ADA. 42 U.S.C. § 1981a(a)(2) & (b)(1).

[*10]  CONCLUSION

For the foregoing reasons, the court will grant Volvo's motion to dismiss in its entirety.

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

April 10, 1998

Frank W. Bullock, Jr.

United States District Judge

*ORDER*

BULLOCK, Chief Judge

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

    IT IS ORDERED THAT Defendant Volvo Trucks North America, Inc.'s motion to dismiss [Doc. # 9] the Second Claim for Relief and the Third, Fourth, and Fifth Causes of Action in Plaintiff's amended complaint be, and the same hereby is, **GRANTED**, and the Second Claim for Relief and the Third, Fourth, and Fifth Causes of Action in Plaintiff's amended complaint be, and the same hereby are, **DISMISSED**.

    April 10, 1998

    Frank W. Bullock, Jr.

    United States District Judge



**Emmaline E. Shella, Plaintiff, v. Angela C. Foster, PC and Angela C. Foster, Attorney, Defendants.**

**NO. COA05-342**

**COURT OF APPEALS OF NORTH CAROLINA**

**2006 N.C. App. LEXIS 1216**

**November 3, 2005, Heard in the Court of Appeals**
**June 6, 2006, Filed**

**NOTICE:**

[*1] PURSUANT TO RULE 32(b), NORTH CAROLINA RULES OF APPELLATE PROCEDURE, THIS DECISION IS NOT FINAL UNTIL EXPIRATION OF THE TWENTY-ONE DAY REHEARING PERIOD. THIS IS AN UNPUBLISHED OPINION. PLEASE REFER TO THE NORTH CAROLINA RULES OF APPELLATE PROCEDURE FOR CITATION OF UNPUBLISHED OPINIONS.

**SUBSEQUENT HISTORY:** Reported at Shella v. Foster, 630 S.E.2d 256, 2006 N.C. App. LEXIS 1256 (N.C. Ct. App., June 6, 2006)

**PRIOR HISTORY:** Guilford County. No. 02 CVS 11260.
Shella v. Foster, 164 N.C. App. 598, 596 S.E.2d 473, 2004 N.C. App. LEXIS 1073 (2004)

**DISPOSITION:** Affirmed.

**COUNSEL:** Emmaline Ellison Shella, pro se plaintiff-appellant.

Gray Newell Johnson & Blackmon, LLP, by Angela Newell Gray, for defendant-appellees.

**JUDGES:** ELMORE, Judge. Judges McCULLOUGH and LEVINSON concur.

**OPINION BY:** ELMORE

**OPINION**

Appeal by plaintiff from order dated 17 June 2003 by Judge William Z. Wood, Jr. and order dated 19 October 2004 by Judge Catherine Eagles in Guilford County Superior Court. Heard in the Court of Appeals 3 November 2005.

ELMORE, Judge.

Emmaline E. Shella (plaintiff) commenced this action by filing a complaint in Guilford County Superior Court on 24 October 2002. Plaintiff alleged that Angela C. Foster (Foster), an attorney, had breached a contract to prepare a separation agreement to plaintiff's satisfaction for a fee of $ 750.00. Foster's draft of the separation agreement was never executed. Plaintiff also asserted claims of fraud, [*2] "tort," and punitive damages. The trial court dismissed plaintiff's claims for fraud, "tort," and punitive damages in an order dated 17 June 2003. By an unpublished decision of this Court, plaintiff's appeal of the 17 June 2003 order was dismissed as interlocutory. *Shella v. Foster*, 164 N.C. App. 598, 596 S.E.2d 473 (2004). In an order dated 19 October 2004, the trial court granted summary judgment to defendants on plaintiff's breach of contract claim. Plaintiff appeals.

We first review the trial court's order granting defendants' motion to dismiss plaintiff's claims of fraud, punitive damages, and "tort" pursuant to Rule 12(b)(6). A

claim for fraud must be pled with particularity. *See* N.C. Gen. Stat. § 1A-1, Rule 9(b) (2005) ("In all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). The essential elements of fraud are: "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974). [*3]

Here, plaintiff alleges that Foster told her to bring $ 750.00 to her office; that Foster did not meet with plaintiff in person; and that Foster refused to return plaintiff's $ 750.00 fee. However, plaintiff does not state the content of any alleged fraudulent representation in connection with these facts. Thus, plaintiff's complaint fails to specifically allege the circumstances of fraud. *See Terry v. Terry*, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981) (plaintiff must allege content of fraudulent representation to meet particularity requirement for pleading actual fraud; mere conclusory language asserting fraud insufficient).

The trial court also dismissed plaintiff's claim for "tort." We agree with defendants that plaintiff failed to state a claim for relief under Rule 8(a)(1) of the North Carolina Rules of Civil Procedure. This Rule requires "[a] short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief[.]" N.C. Gen. Stat. § 1A-1, Rule (8)(a)(1) (2005).

> A pleading [*4] complies with the rule if it gives sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand the nature of it and the basis for it, to file a responsive pleading, and--by using the rules provided for obtaining pretrial discovery--to get any additional information he may need to prepare for trial.

*Sutton v. Duke*, 277 N.C. 94, 104, 176 S.E.2d 161, 167 (1970). If the defendant requires additional facts to proceed with the defense of the case, then the defendant's proper remedy is to file a motion for a more definite

statement. *See id.*; *Homeowners Assoc. v. Sellers and Homeowners Assoc. V. Simpson*, 62 N.C. App. 205, 208, 302 S.E.2d 848, 851 (1983) (where the defendant seeks additional facts beyond the plaintiff's short and plain statement of the claim, remedy is to move for a more definite statement or to use discovery methods). Here, however, the deficiency with plaintiff's complaint was not that it was lacking for facts. Instead, plaintiff did not assert a legally cognizable claim for relief. Plaintiff merely asserted that defendants committed a "tort" against plaintiff. Black's Law [*5] Dictionary defines a tort as "[a] civil wrong for which a remedy may be obtained, usu. in the form of damages[.]" Black's Law Dictionary 1496 (7th ed. 1999). A tort is a broad category of legal claims for relief; alleging a tort does not place the defending party on notice of the elements of a legally recognized claim. The trial court did not err in dismissing plaintiff's claim for "tort."

The trial court also did not err in dismissing plaintiff's claim for punitive damages. The standard for recovery of punitive damages is set forth in N.C. Gen. Stat. § 1D-15, which provides:

> (a) Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
>
> (1) Fraud.
>
> (2) Malice.
>
> (3) Willful or wanton conduct.

N.C. Gen. Stat. § 1D-15(a) (2005). Plaintiff did not allege any facts supporting fraud or willful or wanton conduct. Plaintiff did aver that Foster prepared the separation agreement "with malice" and "with intent of exerting [*6] more stress on the plaintiff." However, a conclusory assertion of malicious conduct in the plaintiff's complaint is not taken as true upon review of a motion to dismiss. *See Miller v. Rose*, 138 N.C. App. 582, 592, 532 S.E.2d 228, 235 (2000) ("In ruling on a Rule 12(b)(6) motion to dismiss, the trial court regards all factual allegations of the complaint as true . . . Legal conclusions, however, are not entitled to a presumption of truth."). Plaintiff simply failed to present any facts in support of fraud, malice, or

willful or wanton conduct by defendants. Her claim for punitive damages was properly dismissed.

Next, plaintiff contends that the trial court erred in granting summary judgment to defendants on the breach of contract claim. Plaintiff's claim is based upon the agreement between herself and Foster that Foster would prepare a separation agreement in return for payment for these services. It is undisputed that Foster did in fact prepare a separation agreement and that plaintiff paid Foster a fee of $ 750.00. Plaintiff contends that the content of the separation agreement was unsatisfactory and in contravention of plaintiff's stated specifications.

Summary [*7] judgment is proper where the moving party shows the lack of any triable issue. *Collingwood v. G.E. Real Estate Equities*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). The moving party may meet this burden "by proving that an essential element of the opposing party's claim is nonexistent[.]" *Id.* "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Plaintiff's forecast of evidence must establish that the parties reached an agreement as to definite and certain terms. *See Miller v. Rose*, 138 N.C. App. 582, 587-88, 532 S.E.2d 228, 232 (2000) (summary judgment for

defendants on breach of contract claim proper where plaintiff's evidence did not show meeting of minds on definite and certain terms); *Orthodontic Ctrs. of Am., Inc. v. Hanachi*, 151 N.C. App. 133, 135, 564 S.E.2d 573, 575 (2002) (burden of proving valid contract is upon party seeking to enforce alleged contract).

Here, plaintiff contends that a contract exists because "[t]he defendant agreed to draft the document [*8] in accordance with the plaintiff's specifications." But the record is lacking in any evidence to indicate what particular terms plaintiff desired to be included in the separation agreement and that Foster and plaintiff agreed that these specific terms would be included therein. In short, plaintiff's evidence fails to establish a meeting of the minds as to the terms of an alleged contract entered into by the parties. As there was no genuine issue of material fact and defendants were entitled to judgment as a matter of law, *see* N.C. Gen. Stat. § 1A-1, Rule 56(c), the trial court properly granted summary judgment on plaintiff's breach of contract claim.

Affirmed.

Judges McCULLOUGH and LEVINSON concur.

Report per Rule 30(e).